## Richmond

## SAMUEL LOWE V. COMMONWEALTH OF VIRGINIA

November 23, 1977.

Record No. 770322.

Present: All the Justices.

*Lester E. Schlitz (Schlitz, Levy & Livesay, Ltd.,* on brief, for plaintiff in error.

*Thomas D. Bagwell, Assistant Attorney General (Anthony F. Troy, Attorney General,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the Court.

Defendant Samuel Lowe was tried without a jury and convicted of robbery, possession of heroin and possession of marijuana. To the November 18, 1976 order sentencing him to confinement for these convictions, we granted defendant a writ of error limited to a consideration of four questions. They deal with the legality of a warrantless arrest, the validity of a

consensual search, the admissibility of inculpatory statements made by the defendant and the correctness of a pre-trial ruling on discovery.[1]

These are the facts, viewed in the light most favorable to the Commonwealth, gleaned from the evidence presented during a suppression hearing and at the trial. On December 19, 1975, Detective Martin F. Twomey, assigned to the Robbery Division of the Norfolk Police Department, was working part-time as a salesclerk at a Norfolk gun shop. A customer, who acted "rather suspicious" in Twomey's opinion, sought to purchase ammunition for a carbine and for a .32 caliber pistol, the customer being unsure whether he needed the .32 caliber ammunition "for an automatic or a revolver." Thereupon, the customer left the store and immediately returned with an "unusual" foreign-made .32 caliber automatic pistol which looked like a .45 caliber gun. The customer purchased a quantity of ammunition for the carbine and, with Twomey's advice, rounds to fit the pistol. Because the customer's "mannerisms in the store didn't seem right," Twomey made a note of his name, age and address — "Samuel Lowe, birthday, 8-30-50, 1448 Longdale Drive, Norfolk, Virginia" — as recorded by the individual upon purchase of the ammunition. As the customer left, Twomey also "jotted down" the license number of the Oldsmobile automobile in which the customer was riding as a passenger.

Three days later, on December 22, 1975, a Norfolk Alcoholic Beverage Control Board (ABC) store was robbed. Twomey was assigned, in the course of his police duties, to investigate. Upon arrival at the scene, Twomey learned that two armed men had committed the crime; one had carried a carbine and the other had used what appeared to an eyewitness to be a .45 caliber pistol. Twomey was told that the pistol-wielding bandit had jumped upon the store counter and fired a shot into the ceiling. The only physical evidence which Twomey found at the scene

---

[1] In addition to the foregoing questions, and in spite of our restriction of the issues, defendant continues to debate on brief and at the bar an issue eliminated from the appeal at the petition stage, *i.e.*, whether a photograph taken of the defendant and used for identification purposes was the fruit of an illegal arrest. We will take no further notice of that contention. *See Reid* v. *Allen*, 216 Va. 630, 632, 221 S.E.2d 166, 168 (1976).

was located near the counter and was a .32 caliber automatic shell casing of the type he had sold his customer in the gun shop on December 19. In the course of the investigation, Twomey obtained detailed physical descriptions of the robbers. In addition, Twomey learned from a witness the license number of a Plymouth automobile used by the robbers as the "getaway" vehicle.

As Twomey was drafting the report of his investigation, it "dawn[ed] on" him that one of the robbers may have been his December 19 gun-shop customer. The eyewitnesses' physical description of one of the robbers [2] was similar to the customer's appearance, as Twomey remembered it. The guns reportedly used in the robbery and the shell casing found at the scene were like the items involved in the earlier ammunition sale.

But at this point, Twomey felt that "it was premature" to seek a warrant for Lowe's arrest. He testified he was uncertain whether his customer had given his correct name at the time he bought the ammunition and he wanted "a little more evidence" that the ammunition purchaser and the robber were the same person. Therefore, Twomey endeavored to find "Samuel Lowe" in order to observe his customer again to determine whether he matched the robber's description.

Twomey then retrieved from his personal papers at home the notes he had made at the gun shop and proceeded to look for "Lowe." He obtained from the Division of Motor Vehicles the description of a Pontiac automobile registered in the name of a "Samuel Lowe" and went to 1448 Longdale Drive, the address given by the customer, on several occasions during the week following the robbery looking for the vehicle, but was unable to find it. Twomey determined that the Oldsmobile which transported his customer to the gun shop was registered to an individual at an address which was on the "next street from Longdale" Drive. He also ascertained that the Plymouth used as the robbers' "getaway" car was a stolen vehicle. During one of his trips to the vicinity of 1448 Longdale Drive, Twomey found the Plymouth parked a "block and a half" from that address.

Thereafter, on December 28, 1975, near 10:00 p.m., Twomey, accompanied by several other police officers, went to the

---

[2] ". . . male Negro, twenty-three, five foot eight, two hundred and fifteen pounds. Black hair, brown eyes, full beard, armed with a rifle, wearing a rust-colored coat."

Longdale Drive address, an apartment building, to "see if the man [he] saw [at the gun shop] was the man named Samuel Lowe living at" that address. Previously, Twomey had "checked the rental agency" and had been told that "no man by that name had rented an apartment at 1448 Longdale." The police had not obtained an arrest or search warrant.

At the address were four apartment units, two "downstairs and two upstairs." In front of the building was parked the Pontiac automobile registered to "Lowe." The officers entered the building (the record does not indicate that the entrance door was locked) and Twomey knocked on the first-floor "left-hand door first" and determined "Lowe" was not there. He next went to the other first-floor unit and told the female answering the door "who [he] was looking for and she stated 'he lives upstairs' and pointed straight up."

The officers went to the second floor and Twomey knocked on the door of apartment 202, but "there was no answer." He knocked again. The door was opened and the defendant was standing "just inside the threshold" with the door "opened inward." Twomey was "just outside the threshold" on the "landing." At that moment, Twomey realized that the person at the door "was the man who came in the gun shop" and determined that he matched the description of one of the robbers. At the same instant, Twomey noticed "[d]irectly behind the defendant, in the living room, there was a bean bag chair and laying right on the bean bag chair side by side were two .30 caliber carbines." Thereupon, Twomey displayed his police badge, identified himself as a police officer, stated to the defendant that he was under arrest for armed robbery, and told Lowe to "put his hands on the wall." Twomey testified he would not have arrested the defendant if he had not been the same person who came to the gun shop on December 19.

Because he saw two carbines on the sofa, Twomey "felt" the other armed robber was in the apartment. In addition, Twomey was concerned for his own safety and that of the other officers. So after defendant was placed under arrest, the officers entered the apartment, with the sole purpose, according to Twomey, "of finding the second man." While Twomey did not pull his gun, several of the other officers drew theirs. Handcuffs were then placed on Lowe and he was given, orally, the warnings required

by *Miranda* v. *Arizona,* 384 U.S. 436 (1966), after which he was ordered to sit on the floor in the living room.

Next, the officers looked into the several rooms of the apartment seeking, without success, the second robber. The police thereafter reholstered their weapons. One of the officers accompanying Twomey then recognized Lowe as a person previously observed at the home of a known drug dealer. Thereupon, Lowe was asked to give his consent to search the entire apartment. Twomey had a "Consent to Search Form," the content of which was explained to Lowe. In addition, the form was read to him in its entirety.[3] The defendant, after the reading, stated: "You go ahead and search, but I ain't signing nothing."

During the ensuing search, a quantity of narcotics, the subject of the drug convictions, was found in the apartment. Thereafter, defendant was taken to the police station and, after he signed a form providing for waiver of his *Miranda* rights, admitted being a participant in the ABC store robbery.

■ The defendant contends that the arrest without a warrant was unlawful and therefore the evidence obtained following the arrest, *viz.,* the narcotics and the inculpatory statements, should have been suppressed as fruits of that illegal arrest, citing *Wong Sun* v. *United States,* 371 U.S. 471 (1963), and its progeny. The

---

[3] The form provided as follows:

"CITY OF NORFOLK
VIRGINIA
POLICE DEPARTMENT
DATE . . . . . . . . . . . . . . . . . .
TIME . . . . . . . . . . . . . . . . . . . . . .

"I, . . . . . . . ., having been informed of my right to refuse to have a search made of the premises hereinafter mentioned, without a search warrant, do hereby authorize . . . . . . . . . . . . . , members of the Norfolk Police Department, to conduct a complete search of my premises located at . . . . . . . . . . . . . . . .

"These officers are authorized by me to take from my premises any articles or property which they may have reason to believe is connected with a crime.

"This written permission is given by me to the above named officers voluntarily and without threats or promises of any kind.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
WITNESSES:
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

initial question then becomes: Was the arrest valid? We think it was.

In attacking the arrest, defendant first argues it was made on mere "suspicion" and without probable cause. He dwells on Twomey's testimony to the effect that he did not seek a warrant before going to the apartment in question because he did not believe sufficient probable cause existed to obtain one, yet "inexplicably," the argument continues, armed with no additional information upon arrival at the apartment, Twomey nevertheless decided when he saw defendant that he then had the necessary probable cause to make the arrest without a warrant. We disagree with this contention that sufficient probable cause was lacking at the time of arrest.

The face-to-face confrontation at the apartment threshold established for the first time one fact in Twomey's mind and it enabled him to reasonably believe other facts, all of which pointed to a conclusion that the person standing at the doorway was one of the robbers. Established was the fact that the person before him was his gun-shop customer. To be reasonably concluded by Twomey from the confrontation was that he was facing an individual who matched the eyewitness description of one of the robbers. This customer-robber link was buttressed by the fact that the customer bought .32 caliber bullets for a gun which initially appeared to Twomey to be a .45 caliber pistol, while a .32 caliber shell was found at the scene of the crime, apparently fired from the robber's gun which, to an eyewitness, looked like a .45 caliber pistol. In addition, the customer purchased ammunition for a carbine and one of the robbers carried such a weapon. And the robber-apartment occupier link was made stronger by the fact that the "getaway" vehicle was found near the apartment. We conclude, therefore, that the officer here, armed with all of the foregoing information, had probable cause at the doorway to arrest defendant without a warrant, that is, such facts and circumstances had developed at that time to justify a person of reasonable prudence and caution in believing that the offense had been committed and that the person to be arrested was the offender. *See United States* v. *Watson,* 423 U.S. 411, 431 n.4 (1976) (Powell, J., concurring); Code § 19.2-81.

■ Continuing to assail the arrest, defendant argues, second, that it took place in defendant's "home." He says that even if

probable cause existed, the Fourth Amendment requires a warrant prior to intrusion into the residence of a suspect for the purpose of effecting an arrest, absent exigent circumstances. And, according to defendant, such necessitous circumstances were not present at the time of this arrest. To the contrary, we believe an exigency existed justifying the warrantless arrest upon probable cause and we consequently reject defendant's argument.[4]

In *Warden* v. *Hayden,* 387 U.S. 294 (1967), the Supreme Court "recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons." *United States* v. *Santana,* 427 U.S. 38, 42 (1976). Here, the officer had just ascertained the whereabouts of the armed robber in this case, who was in close proximity to two deadly weapons in plain view. The other robber may have been in the same apartment. The delay, however slight, incident to obtaining a warrant would likely have resulted in the escape of at least one armed perpetrator of a crime of violence, thereby increasing the danger of further violence to the police themselves and to the community at large. Swift apprehension was required under these circumstances. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden* v. *Hayden, supra,* 387 U.S. at 298-99.

Accordingly, we conclude that the trial court properly determined that the circumstances of defendant's arrest had no effect on the admissibility of either the narcotics or the inculpatory statements.

■ As an alternative ground for suppression of the drugs, defendant argues that the consent to search was involuntary because it was given under duress. Defendant points out that he was in custody, handcuffed, sitting on the floor and surrounded by his armed captors; additionally, he says his refusal to sign the

---

[4] There is no direct proof that this apartment was defendant's "home." He was not the lessee, although he apparently "lived" there at the time of the arrest. Also, it may be debated whether the actual arrest technically took place within the private confines of the apartment considering the defendant's location at the threshold with the door open. In the view we take of the case, we need not determine these questions. Therefore, we will agree with defendant and assume without deciding that his arrest took place within his "home."

waiver form also demonstrated his reluctance to agree to the search. He thus contends the consent was invalid because it was coerced. There is no merit to this contention.

The fact of custody alone is not enough in itself to demonstrate a coerced consent to search. *United States* v. *Watson, supra,* 423 U.S. at 424. But the burden is on the Commonwealth to prove the voluntariness of any consent. *Hairston* v. *Commonwealth,* 216 Va. 387, 388, 219 S.E.2d 668, 669 (1975), *cert. denied,* 425 U.S. 937 (1976). And whether the consent was actually freely given is a question of fact to be determined from "the totality of all the circumstances." *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227 (1973).

We think the evidence is sufficient in this case to support the trial court's ruling that the Commonwealth carried its required burden of proof. The testimony of the officers showed, and the defendant admitted during the suppression hearing, that the Consent to Search Form, note 3 *supra,* was read to him; the officers stated that it was also explained to defendant. He was thus possessed of the knowledge that he had the right to withhold consent, yet the evidence is that defendant stated: "You go ahead and search. . . ." Moreover, there was positive testimony from the officers that their guns were not drawn at the time and that no threats or promises were made to defendant. As a matter of fact, when defendant learned before the consent that the officers suspected he was a drug user, defendant offered to obtain for the police his drug paraphernalia from the apartment bathroom. In sum, the record conclusively shows the Commonwealth met the test of voluntariness, approved in *Schneckloth,* 412 U.S. at 229, in that the consent was "the product of an essentially free and unconstrained choice by its maker" and that defendant's will had not "been overborne and his capacity for self-determination [had not been] critically impaired", *id.* at 225.

■ Finally, defendant contends he was denied pre-trial access to exculpatory information concerning the robbery because the trial court refused his request, contained in a motion for a bill of particulars, that the Commonwealth be ordered to file "[t]he names and addresses of all persons who were present at the time the alleged offense was committed." Defendant argues (in the face of his admission that he was a participant in the robbery) that identification of defendant was an "important factor" in the

case. He says that the evidence shows there were at least six eyewitnesses to the robbery, yet only two testified and they identified defendant as one of the robbers. Defendant contends that: *"If* [the witnesses not called] *would* testify that the defendant was not one of the robbers, their testimony *would be exculpatory* and should have been made available to the defendant" (emphasis added). The obvious speculation inherent in the foregoing contention is fatal to the validity of the position defendant takes. In the first place, there is no showing that the police and prosecutor knew the names and addresses of all the witnesses to the robbery. Secondly and more importantly, the record fails to reveal that the testimony of any of the uncalled witnesses, whether or not their whereabouts were known, would exculpate the defendant.

There is no general constitutional right to discovery in a criminal case and the case of *Brady* v. *Maryland,* 373 U.S. 83 (1963), relied on by the defendant, did not establish one. *Weatherford* v. *Bursey,* 429 U.S. 545, 559 (1977). Our rule providing for discovery in a criminal case, Rule 3A:14, contains no provision requiring the Commonwealth to furnish the names and addresses of the eyewitnesses to a crime. We said, however, in *Stover* v. *Commonwealth,* 211 Va. 789, 795, 180 S.E.2d 504, 509 (1971), *cert. denied,* 412 U.S. 953 (1973), quoting *Brady,* that "[i]t is now settled that 'the suppression by the prosecution of evidence favorable to the accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " At the core of this due process rule of fairness is that the evidence must be exculpatory, favorable to the accused. Here, defendant's argument urges us to assume that critical basic fact, without support from the record. There is not the slightest indication the Commonwealth withheld information favorable to defendant. Actually, the trial court, upon defendant's motion, ordered the prosecutor to furnish exculpatory information "of whatever form, source or nature", and there is no direct claim that this order was not complied with. Defendant merely contends that "if" the uncalled witnesses "would" testify that defendant was not one of the robbers, their testimony "would be exculpatory." Such conjecture is insufficient to bring the motion here under the rule of *Brady* and *Stover.*

Defendant also relies on *United States ex rel. Meers* v. *Wilkins,* 326 F.2d 135 (2d Cir. 1964). That decision is inapposite. There, the court held the prosecutor had improperly failed to make known to the defense the existence of two disinterested witnesses to a robbery. But in that case, identity of the witnesses and the exculpatory nature of their testimony was known to the prosecution at the time of the trial, a circumstance not present in this case.

For these reasons, the judgment of convictions here will be

*Affirmed.*