William G. ROBERTS, Plaintiff,

v.

COUNTY OF FAIRFAX, VIRGINIA,
Defendant.

Civ. A. No. 1:95CV1528.

United States District Court,
E.D. Virginia.
Alexandria Division.

Aug. 13, 1996.

Thomas R. Breeden, Thomas R. Breeden, P.C., Manassas, Virginia, for Plaintiff.

David P. Bobzien, County Attorney, Ann Gouldin Killalea, Assistant County Attorney, Fairfax, Virginia, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Summary judgment in this ADA[1] action presents the relatively routine question whether plaintiff was a "qualified individual with a disability" within the meaning of the Act. Also presented is a second question that is neither routine nor definitively settled in this circuit, namely, whether the findings of a local administrative body should be given preclusive effect in a federal ADA suit, particularly where, as here, the body acted pursuant to a grievance procedure mandated by state law.

## I.

Plaintiff William G. Roberts began working for the Fairfax County Fire and Rescue Department ("Department") in June 1976. So far as this record discloses, his progress in the Department for the first fifteen years was normal. Thus, in April 1991, he was promoted to the rank of Emergency Medical Services ("EMS") Sergeant. Thereafter, however, Roberts' career advancement pace slowed when his next two performance evaluations, the first after six months in the new position, the second after a year, highlighted serious weaknesses in his emergency scene management skills. As a result, in April 1992, Roberts' probationary period was extended beyond the usual twelve months.[2]

In late December 1991, during the initial probationary period, Roberts advised Battalion Chief Leonard Murray that he was having marital problems and would be unable to report to work. Murray responded by granting Roberts leave and advising him to seek help at Woodburn Community Mental Health Center Emergency Services ("Emergency Services") and the County Employee Assistance Program ("EAP"). Roberts

heeded this advice and consulted Dr. Robert Miller at Emergency Services on four occasions between December 31, 1991, and January 10, 1992. He also had a number of counseling sessions with psychologist Sharon Love at EAP in January 1992. Roberts remained on leave from work until January 10, at which time Love released him to return to light duty. Two weeks thereafter, Love released Roberts to return to full duty, but both Love and Miller recommended that Roberts continue treatment. Despite the release by Love, Roberts claims that he felt unable to return to work on January 10 and 24, and that he in fact returned only because Murray told him he had to do so; at the time, however, he did not communicate to Miller, Love, or anyone in the Department that he felt unable to return to work.

Contrary to Miller's and Love's recommendations, Roberts did not continue treatment after January 1992. And he admits that after January 1992, his supervisors suggested on numerous occasions that he seek help for his mental and personal problems. Thus, while Roberts was assigned to work under Lieutenant Gary De Brueler from September through November 1992, DeBrueler advised him to seek treatment, telling him in effect that he was "not thinking straight" and needed professional help. Similarly, between January and May 1993, Roberts worked under Lieutenant Gregory MacIntosh, who urged Roberts on numerous occasions to seek EAP counseling for his personal problems. Deputy Chief Carl Plaugher also suggested to Roberts that he needed counseling. Roberts rejected all this advice and sought no treatment or counseling from January 1992 until the end of March 1993.

Throughout this period, Roberts continued to experience problems with emergency scene management. As a result, a proposal to demote him issued on November 19, 1992. The proposal invited Roberts to respond, which he did in two written submissions, neither of which asserted that his poor performance was due to depression or any other mental disorder. In any event, Roberts was

---

**1.** Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

**2.** The length of this extension is not reflected in the record, nor is it material.

not then demoted, though he was told on December 30, 1992, that his emergency scene management performance would be evaluated again in four months.

Beginning March 29, 1993, Roberts finally sought treatment again, this time with psychologist Sharon Alperstein and Dr. Ralph Wittenburg, both of whom prescribed counseling and medication. In a letter dated April 14, 1993, Dr. Wittenburg opined that Roberts' treatment (counseling and medication) would not interfere with his work, but that his depression, if left untreated, would do so. Wittenburg's letter also advised that Roberts' mental condition should improve within ten days to two weeks.

On April 8, 1993, less than two weeks after Roberts sought treatment, an incident occurred reflecting his continuing problems with emergency scene management. Specifically, Roberts, acting as the officer-in-charge at an emergency involving a cardiac arrest, was relieved because he was unable to control the scene and gave inappropriate medical directions. A similar incident occurred a few weeks later on April 26, 1993. In that event, Roberts responded as the officer-in-charge to a minor automobile accident where an injured victim was experiencing a seizure. When Roberts arrived, an EMS captain, already at the scene, twice instructed Roberts to contact the hospital for an order of Valium. Roberts ignored both orders and instead attempted to obtain patient information, despite the captain's statement to him that patient information had already been obtained. In the circumstances, the EMS captain relieved Roberts as the officer-in-charge.

Thereafter, by memorandum dated May 18, 1993, Roberts was again proposed for demotion. And once again, he was provided an opportunity to respond, which he did, advancing, for the first time, his mental condition as an explanation or excuse for his performance problems. Even so, Roberts

was demoted from the rank of sergeant to technician, effective July 9, 1993.

Roberts conceded that he did not properly perform his job functions between December 1991 and May 1993. Yet, he nonetheless contested his demotion pursuant to Fairfax County's grievance procedure, claiming that because he suffered from clinical depression, his demotion violated the ADA. Pursuant to the grievance procedure, a three-day hearing was held in November 1994 before the Fairfax County Civil Service Commission ("Commission"), the body appointed by the Fairfax County Board of Supervisors to adjudicate employee grievances. Roberts was represented by counsel throughout the grievance process, which culminated in the hearing before the Commission. At the hearing, he was afforded the opportunity to present testimony and documentary evidence and to cross-examine the Department's witnesses. The record reflects that he presented the testimony of six witnesses, including himself, and submitted 45 exhibits. For its part, the Department presented the testimony of six witnesses and submitted 39 exhibits. Acting promptly, the Commission rendered its written decision on November 21, 1994, denying the grievance on alternative, dispositive grounds. First, the Commission ruled that there was no ADA violation because Roberts had failed to establish that he was a "qualified individual with a disability" within the meaning of the ADA. *See* 42 U.S.C. § 12112(a) (prohibiting certain discrimination against "qualified individual with a disability"). Second, the Commission found that Roberts' poor job performance furnished just cause for the demotion.

During the pendency of the Commission proceedings, Roberts filed a charge with the EEOC on January 7, 1994, alleging discrimination in violation of the ADA. By EEOC letter dated August 3, 1995, Roberts received notice of his right to institute a civil action under Title I of the ADA. He then filed this action against Fairfax County on November 2, 1995.[3] Following discovery, defendant

---

3. Five weeks later, on December 9, 1995, Roberts was promoted to the rank of lieutenant, which, following the 1995 restructuring of the Department, is equivalent to the rank of sergeant Roberts held until his demotion in July 1993.

There is, of course, no mootness issue because Roberts claims damages for the act of demotion itself and for the intervening period, from July 1993 to December 1995.

now brings the instant motion for summary judgment, arguing:

(1) that the decision of the Commission should be given preclusive effect in this case;

(2) that Roberts is not a "qualified individual" within the meaning of the ADA because he did not seek counseling, as his supervisors urged him to do, and because there were no reasonable accommodations which would have enabled Roberts to perform his job in May 1993;

(3) that Roberts' demotion was not the result of impermissible discrimination; and

(4) that Roberts' claim of ongoing discrimination must fail because no further adverse employment actions have been taken against him.

## II.

█ The threshold, dispositive question is whether the Commission's findings are entitled to preclusive effect. If so, Roberts' claim must fail in this forum, as it did in that one.

The question of the preclusive effect of state grievance panel findings in an ADA case has not yet been specifically decided in this circuit. There is, however, substantial authority pointing persuasively to the conclusion that in appropriate circumstances, such findings are entitled to preclusive effect in an ADA action. Thus, the Supreme Court has recognized on a number of occasions that "it is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity." *University of Tennessee v. Elliott*, 478 U.S. 788, 797, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986) (noting previous cases); *see also United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (holding that factfinding by Advisory Board of Contract Appeals was binding in subsequent Court of Claims action between same parties); *Kremer v. Chemical Construction Co.*, 456 U.S. 461, 484–85 n. 26, 102 S.Ct. 1883, 1899 n. 26, 72 L.Ed.2d 262 (1982)

(approving *Utah Construction*). *Elliott* is particularly instructive on this general principle. There, the Supreme Court refused to give federal common law preclusive effect to unreviewed *administrative* proceedings by state agencies in Title VII cases, but stated that *adjudicative* proceedings would stand on a different footing.

> [W]hen a state agency acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.

*Elliott*, 478 U.S. at 799, 106 S.Ct. at 3226 (quotation and citation omitted).

The application of this sound principle to ADA cases requires no great leap, for the Title VII employment procedures are applicable in ADA cases as well. *See* 42 U.S.C. § 12117(a).[4] Indeed, the Fourth Circuit has applied this principle to civil rights cases under 42 U.S.C. § 1983, citing *Elliott*. *See Layne v. Campbell County Dep't of Social Services*, 939 F.2d 217 (4th Cir.1991). Specifically, *Layne* held that the findings of fact made by a grievance panel pursuant to the grievance procedure mandated by Virginia law must be given preclusive effect in § 1983 actions in federal courts.

Here, the Commission's grievance procedure clearly met all the prerequisites set out in *Elliott* and *Layne* for preclusive effect. First, here as in *Layne*, the procedure was mandated by state law. *See* Virginia Code § 2.1–114.5:1. Also mandated by state law is that the grievance procedure be given binding effect in the state courts of Virginia, as the governing statute provides that the decision of the Commission pursuant to this procedure is final and binding on all parties. *See* Virginia Code § 15.1–7.2(10)(a)(6). Indeed, the statute further provides that "[e]ither party may petition the circuit court ... in the locality in which the grievant is employed for an order requiring implementation

---

4. The powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures this subchapter provides to ... any person alleging discrimination on

the basis of disability in violation of any provision of this chapter ... concerning employment.
*Id.*

of a binding decision from the Commission." Virginia Code § 15.1–7.2(11). There is no doubt that the Commission's findings are final, binding, and enforceable in Virginia.

Further, as required by *Elliott,* the grievance procedure in this case involved the Commission, "a state agency acting in a judicial capacity" to resolve factual issues that the parties had "adequate opportunity to litigate." Thus, the Commission conducted a prehearing conference to define issues, took evidence in the form of exhibits and testimony from witnesses who were subject to cross-examination, made findings of fact, ordered an appropriate remedy, and made a record of the entire proceeding. Nor is there any doubt that Virginia law regards the Commission as a judicial body, for an aggrieved county employee has no recourse save to bring an action in Virginia before the Commission; the employee may seek relief from the circuit courts of the state only to enforce a ruling the Commission has rendered. Accordingly, the Commission's proceedings may well be state judicial proceedings entitled to full faith and credit pursuant to 28 U.S.C. § 1738. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 476, 102 S.Ct. 1883, 1894–95, 72 L.Ed.2d 262 (1982) (holding that state judicial proceedings are entitled to preclusive effect in Title VII claims pursuant to § 1738). Support for this view is found in a recent, unpublished Sixth Circuit decision. *See White v. A.C. Gilless,* No. 94–5191, 1995 WL 39524 (6th Cir. Feb. 1, 1995). In *White,* the Sixth Circuit panel held that the district court in a Title VII claim properly gave preclusive effect to the factual findings of a civil service merit board. Relying on *Elliott,* the panel attributed its finding of preclusion to the fact that the merit board "acted in a judicial capacity, resolving disputed issues of fact after giving the parties a full and fair opportunity to litigate the issues." *White,* slip. op. at 5–6 (citing *Elliott* ). Precisely the same may be said of the Commission's handling and disposition of Roberts' grievance; in resolving Roberts' grievance, the Commission plainly "acted in a judicial capacity" by resolving disputed factual issues after "giving

the parties a full and fair opportunity to litigate the issues." *See id.*

Roberts, of course, takes a different view of the Commission's proceedings in an effort to avoid the reach of *Elliott* and *Layne.* While conceding that findings of fact made after a due process hearing before an adjudicative body would merit preclusive effect in his case,[5] he contends that he was not afforded due process in the Commission proceedings, and therefore that the Commission acted solely as an administrative body in considering his grievance. This contention is unpersuasive; none of the alleged shortcomings he cites amounts, individually or collectively, to a denial of due process.

■ First, Roberts complains that he was unable to compel the attendance of witnesses or to compel discovery. It is settled, however, that "[p]rovision for compulsory process for witnesses is not an essential element of due process at an employee's grievance hearing." *Detweiler v. Commonwealth of Virginia Dep't of Rehabilitative Services,* 705 F.2d 557, 560 (4th Cir.1983). And Roberts has no federal or state constitutional right to discovery. *See Strickler v. Commonwealth,* 241 Va. 482, 404 S.E.2d 227 (1991); *Lowe v. Commonwealth,* 218 Va. 670, 239 S.E.2d 112 (1977). Still, Roberts argues that he had a right to these records because the Department agreed to provide them, and because the Commission's own procedural rules mandate the exchange of agreed-upon discovery. Yet, even assuming the truth of these factual assertions, the only apparent Commission sanction for a violation of these discovery rules is exclusion of the evidence not produced. As it happened, the Department did not attempt to introduce the disputed records at the Commission hearing. And quite apart from this, at least some of the disputed records were personnel files of other employees, which were irrelevant to his ADA claim and would not be admissible were the matter to go to trial. *See* Rules 402 & 403, Fed. R.Evid.

---

5. Specifically, Roberts admits in his brief opposing defendant's motion that "[t]he law is clear under Title VII that if a due process hearing has been provided, the decision of that hearing will be enforced."

Roberts next contends that the Commission refused to allow his counsel to present legal arguments regarding the ADA, telling him instead to submit a memorandum after the hearing. He further contends that the Commission then proceeded to rule later that day without allowing Roberts to submit the additional memorandum. These contentions are specious. The transcript attached to Roberts' own opposition brief clearly shows Roberts' counsel making legal arguments at the hearing, including references to relevant case law. Equally clear from the transcript is that the Commission merely asked Roberts' counsel to provide only case names, without the citations, during argument, but told him he could provide the citations after the hearing. This falls far short of a due process denial.

In sum, Roberts received all the process he was due; he was given a full and fair opportunity to litigate his grievance before the Commission, which acted in its judicial capacity in resolving the issues. From this, and from the fact that the grievance procedures are mandated by state law, it follows that the Commission's factual findings—namely, that (1) Roberts failed to show he was a "qualified individual with a disability," and (2) just cause existed to demote Roberts for his poor performance—must be given preclusive effect in this suit. Either finding, by itself, warrants summary judgment in defendant's favor, for in the event Roberts is not a "qualified individual with a disability," he cannot make out a *prima facie* case under the ADA. *See Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 212–13 (4th Cir.1994); *see also infra* part III. And even assuming he could establish a *prima facie* case, Roberts' claim still fails given the Commission's finding that the Department had just cause to demote him for his unsatisfactory performance. That finding prevents Roberts from showing, as he must to recover under Title I of the

ADA,[6] that the Department demoted him solely because of his disability. *See Ennis v. Nat'l Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir.1995); *see also infra* part IV.

### III.

An alternative, independent basis for awarding defendant summary judgment is Roberts' inability to meet the ADA's threshold "qualified individual" requirement.

The ADA prohibits an employee from discriminating against a "qualified individual with a disability" because of that disability. *See* 42 U.S.C. § 12112(a). A "qualified individual with a disability" is

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C. § 12111(8). In determining whether an ADA plaintiff is so qualified, a court must consider (1) whether he can perform the essential functions of the job at issue, and (2) if not, whether any reasonable accommodation by the defendant would enable him to perform those functions. *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir.1994).

### A.

Inherent in the definition of a "qualified individual" under the ADA is a significant limitation: the individual must be willing to accept his employer's efforts at reasonable accommodation if the accommodation is necessary for the individual to perform his job. The ADA implementing regulations embody precisely this principle by providing that

> [a] qualified individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which

**6.** Although the complaint purports to state claims pursuant to both Title I and Title II of the ADA, only the former is applicable in this context. Title II applies only to the provision of government services, which are not present or in issue here. *See* 42 U.S.C. § 12132 (prohibiting denial of benefits of "services, programs, or activities of a public entity" to qualified, disabled individual). When asked at oral argument whether any authority exists for construing the term "government services" to include "government employment" despite the existence of Title I, Roberts' counsel could cite no such authority. Thus, Roberts' complaint does not state a claim under Title II of the ADA, and summary judgment of his claim pursuant to Title I ends his case.

such qualified individual chooses not to accept.[7] However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.

29 C.F.R. § 1630.9(d). Citing this provision, the Sixth Circuit has ruled recently that an employee who was having performance problems stemming from migraine headaches was not a "qualified individual" under the ADA because she declined to avail herself of the accommodations her employer had made available to her. *Hankins v. The Gap, Inc.*, 84 F.3d 797 (6th Cir.1996). In that case, the plaintiff attempted to argue that she was not adequately notified of the possibility of taking leave as an accommodation. The Sixth Circuit, however, concluded that even if this were true, it should have been self-evident to Hankins that taking leave was what she needed to do when a migraine occurred. *Id.* at 801. In addition, the court concluded that Hankins' refusal to accept an available reasonable accommodation precluded her from arguing that other accommodations should have been provided. *Id.* at 802.

The *Hankins* reasoning applies with equal force to this case. Roberts concedes that he did not properly perform his responsibilities as an EMS sergeant, but blames his shortcomings on his mental condition. Yet, Dr. Wittenburg found in April 1993 that, with treatment, Roberts' depression should not affect his work performance. And it is undisputed that several of Roberts' supervisors urged him to seek treatment, which he refused to do for a period of more than fourteen months. Under 29 C.F.R. § 1630.9(d) and *Hankins*, Roberts' refusal to seek the recommended and available treatment precludes him from being a "qualified individual with a disability" under the ADA.

Roberts seeks to avoid this result by advancing the somewhat arresting argument that the Department had a legal duty to *require* him to obtain counseling or face discipline. He claims there is support for this contention in *Ferguson v. U.S. Dep't of Commerce*, 680 F.Supp. 1514 (M.D.Fla.1988),[8] and *Whitlock v. Donovan*, 598 F.Supp. 126 (D.D.C.1984), both of which, according to Roberts, found a violation of the Rehabilitation Act in an employer's failure to require its employee to obtain counseling for alcoholism. In advancing this argument, Roberts goes so far as to accuse the Department of contributing to the progression of his disability by delaying his entry into treatment. The argument is specious. The ADA requires only that employers offer qualified employees a reasonable accommodation; it does not require the employer to force or coerce the employee into accepting the accommodation. Indeed, force or coercion would contravene the ADA, which clearly states that an employee need not accept a proffered accommodation. *See* 42 U.S.C. § 12201(d). Simply put, nothing in the ADA alters the sensible fact that legally competent adults, like Roberts, are responsible for making their own decisions concerning whether to seek counseling or other professional treatment for their problems. And this is so even when the treatment of counseling is a proffered reasonable accommodation under the ADA.

Roberts' authority is not to the contrary. First, *Ferguson* does not stand for the proposition for which it is cited by Roberts; it merely states that a federal employer must *offer* counseling to an employee suspected of having an alcohol problem, not that the employer must *require* such counseling. Second, *Whitlock* is distinguishable, for it involved a federal government employee. And the Rehabilitation Act of 1973,[9] under which the case was brought, imposes an affirmative obligation on federal employers to establish affirmative action programs for the advance-

---

7. This sentence appears almost verbatim in the statute itself. *See* 42 U.S.C. § 12201(d).

8. The decision in *Ferguson* was vacated and withdrawn after the parties resolved the matter.

*Ferguson v. U.S. Dep't of Commerce*, 694 F.Supp. 1541 (M.D.Fla.1988).

9. 29 U.S.C. § 701 *et seq.*

ment of handicapped individuals in federal employment, and not merely to refrain from discriminating against these individuals. *See* 29 U.S.C. § 791. To the extent that the language in *Whitlock* might be read to suggest a general obligation, apart from the Rehabilitation Act, to coerce employees to obtain treatment, the suggestion is unsupported and unsupportable. To rule otherwise here would effectively countenance an erosion of personal responsibility that finds no basis in the ADA or sound public policy. The fact is, Roberts simply cannot avoid the consequences of his persistent refusal to obtain help by shifting the blame to his employer. Life, after all, is making choices and living with the consequences; Roberts made a choice not to avail himself of the proffered accommodation of counseling and treatment, and one consequence of this decision, under *Hankins* and 29 C.F.R. § 1630.9(d), is that Roberts is not a "qualified individual" under the ADA.

### B.

Defendant also argues that there was no reasonable accommodation at the time of Roberts' demotion that would have enabled him to perform the essential functions of his position. If correct, this would be an alternative basis for finding that Roberts is not a "qualified individual with a disability." *See Tyndall*, 31 F.3d at 213 (noting that to be "qualified individual" under ADA, plaintiff must demonstrate ability to perform essential elements of job with reasonable accommodation). On the present record, however, defendant has not established as a matter of law that the Department could not have reasonably accommodated Roberts' disability in a manner that would have allowed him to perform his job adequately.

■ In this regard, Roberts contends that there are four feasible and reasonable ways in which the Department might have accommodated his disability. Thus, he contends the Department should have accommodated his disability by (1) granting him additional leave in January 1992 to allow him to recover fully; (2) assigning him to nonfield duty; (3) assigning him regularly scheduled work hours (as opposed to the normal 24-hour rotating shift schedule), and (4) requiring him to obtain counseling and treatment. At the threshold, Roberts is barred from making this argument, for under *Hankins*, his refusal to accept the accommodation offered him precludes him from arguing that defendant should have offered other accommodations. *Hankins*, 84 F.3d at 802.

■ Quite apart from this threshold bar to Roberts' argument, the first and last proposed accommodations are not, as a matter of law, reasonable accommodations the Department should have, or could have, offered him. The last has already been dealt with; it simply is not the case that the ADA required the Department to force or coerce Roberts to seek counseling. And with respect to the issue of additional leave, Love, Roberts' therapist in January 1992, advised the Department that Roberts was then ready to return to work—with continued treatment. Further, it is undisputed that Roberts did not request additional leave at that time, nor did he tell Love he felt unable to return to work. Although Roberts claims this is because Murray ordered him to return to work, this claim is unpersuasive because he never expressed a need for more time off, either to Murray or to Love. Nor does Roberts claim that he was denied leave at any other time before his demotion.

Roberts' other two proposed accommodations stand on a different footing, for it appears that both involve genuinely disputed facts. First, Roberts argues that defendant should have accommodated his disability by assigning him nonfield duty. Defendant, for its part, contends that the distinguishing characteristic and reason for the position of EMS sergeant is to supervise EMS personnel in the field. If true, this means that the Department had no duty to accommodate Roberts' disability by essentially giving him another job. *See Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995) ("the duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands of his present position"). Yet, defendant does admit that "from time to time persons of this class [EMS sergeant] are assigned to staff

positions." Thus, it is unclear at this time whether the "distinguishing characteristic" of Roberts' job was in fact field work. This would be a factual issue for trial, were the claim not barred for other, independent reasons. *See supra* parts II, III.A.

Similarly, with respect to altering Roberts' work hours, defendant argues that this accommodation would have placed an undue hardship on the Department's operations,[10] and therefore that the Department was not required under the ADA to offer the accommodation. *See* 42 U.S.C. § 12112(b)(5)(A); *see also Myers v. Hose,* 50 F.3d at 283 (noting that ADA mandates only reasonable accommodations). This, however, is another disputed question of fact. Because defendant has not shown as a matter of law that there were no reasonable accommodations the Department could have offered Roberts, summary judgment on this ground is inappropriate.[11]

## IV.

█ There is yet another basis for concluding that Roberts has not made out a *prima facie* case under the ADA and, therefore, for awarding summary judgment to defendant here. It is now settled that the traditional *McDonnell Douglas* Title VII analysis [12] also applies to ADA claims, "at least in those circumstances where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." *Ennis v. The Nat'l Ass'n of Business and Educ. Radio, Inc.,* 53 F.3d 55, 57–58 (4th Cir.1995). The case at bar presents precisely those circumstances, and so the *McDonnell Douglas* analysis applies.

█ Under this familiar analytical framework, a plaintiff is vulnerable to summary judgment unless he can show a jury issue as to whether the adverse employment action taken against him "occurred under circumstances that raise a reasonable inference of unlawful discrimination." *See id.* at 58 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)). Here, Roberts has failed to present even a scintilla of evidence that links the Department's decision to demote him to his mental condition or otherwise suggests that the demotion occurred under circumstances permitting an inference of impermissible discrimination. Accordingly, defendant is alternatively entitled to summary judgment on this ground.[13]

10. This is because all EMS sergeants operate on a rotating 24–hour schedule. Thus, if Roberts were to work 8–hour days, for example, there would be no one to cover the other 16 hours of the 24–hour shift.

11. In opposing this summary judgment ground, Roberts also contends that the Department should have accommodated his disability by simply allowing him to complete the treatment he had begun. Put another way, Roberts' contention here is essentially that he needed no accommodation from the Department, and was fully able to perform his job, *at the time he was actually demoted.* The current record contradicts this contention. For support, Roberts points to the April 14, 1993 letter from Dr. Wittenburg, which Roberts claims establishes that the treatment Roberts was then receiving would allow him to perform his job adequately. More precisely, however, Dr. Wittenburg's letter merely states that Roberts' *treatment* should not interfere with his work, but that his mental condition, left untreated, would do so. Dr. Wittenburg did not opine—nor could he—that Roberts was then performing his essential job functions satisfactorily. In addition, Dr. Wittenburg stated in this April 14 letter that Roberts' condition would improve within ten days to two weeks, yet Roberts had to be removed from command in an emergency situation twelve days later. At that point, shortly before the Department's decision to demote him, he was clearly not performing adequately the essential functions of an EMS sergeant. Given this and given Roberts' documented, undisputed two-year history of less than adequate performance as an EMS sergeant, it is doubtful that he was qualified to perform his job without accommodation at the time of his demotion. In any event, the Court's other rulings on this summary judgment motion render it it unnecessary to resolve Roberts' contention in this regard.

12. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

13. Defendant further argues that Roberts' demotion was not the result of unlawful discrimination, relying on *EEOC v. Kinney Shoe Corp.,* 917 F.Supp. 419 (W.D.Va.1996) (unpublished). The court in *Kinney Shoe* held that "employers are allowed to consider an employee's specific disability in making personnel decisions." *Id.* (citing *Tyndall v. National Education Centers, Inc.,* 31 F.3d 209 (4th Cir.1994). Thus, "if the employer acts on account of a record of harmful behavior that is directly attributable to the dis-

## V.

Finally, defendant requests summary judgment dismissing the claim in Roberts' complaint that he has been subjected to continuous, ongoing discrimination as a result of his demotion in mid–1993. Specifically, Roberts claims (1) that the Department has incorrectly continued to view him as suffering from a mental impairment which interferes with his ability to perform essential functions of his job, and (2) that he suffered ongoing discrimination resulting from his demotion in the form of lower pay and fewer benefits as a technician rather than a sergeant.

The first claim fails on the current record because Roberts has pointed to no discrete, adverse employment action that has been taken against him since his demotion, nor has he adduced any evidence that he was treated any differently from anyone else in the Department. *See, e.g., Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980) (noting need under Title VII to identify precisely "the unlawful employment practice"); *McCausland v. Mason County Board of Educ.,* 649 F.2d 278, 279 (4th Cir.1981) (finding Title VII claim time-barred because of failure to allege overt act of discrimination).

And the law is clear that Roberts' second allegation of ongoing discrimination fails as well. Any consequences of the May 1993 demotion that may have extended beyond the actual demotion date, namely loss of pay until he was promoted again in December 1995, lower current pay from loss of incremental raises over the 30–month period he was only a lieutenant, and loss of seniority, do not, as a matter of law, transform a single employment decision, *i.e.* Roberts' demotion, into ongoing discrimination. *See,*

*e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (holding that continuing impact on pay and benefits resulting from act of discrimination does not constitute continuing violation); *Polsby v. Chase,* 970 F.2d 1360, 1365 n. 3 (4th Cir.1992) (distinguishing "continuing violation" of Title VII from violation arising simply from failure to correct past discrimination). Indeed, to hold otherwise would effectively, but inappropriately, convert every adverse employment action into a claim of ongoing discrimination. Of course, were Roberts' claim of discriminatory demotion to survive this motion and succeed at trial, he might well be entitled to damages for his lower pay, loss of incremental raises, and loss of seniority. He would not, however, be entitled to any liquidated or punitive damages based on an ongoing discrimination theory.

An appropriate Order has already issued.

ability, unlawful discrimination is not present." *Id.* As Roberts notes, however, this reasoning should only be available if the disability is not subject to reasonable accommodation. Otherwise, the proposition for which defendant cites *Kinney Shoe* would effectively nullify the ADA's requirement that employers attempt such accommodation. And, as noted above, whether Roberts' disability was capable of reasonable accommodation is, in part, a disputed fact at this time.

Defendant also argues that the Department could not have acted with discriminatory animus towards Roberts because (1) although he was first diagnosed with depression in late 1991 or early 1992, he was not demoted until May 1993; and (2) he was promoted again in December 1995. These arguments are not conclusive at this stage. Simply because the Department did not discriminate at Time A or Time C does not mean that it did not discriminate at Time B. Moreover, Roberts' mental condition may well have disappeared before the later promotion. Accordingly, summary judgment on these grounds is not warranted.