# CIRCUIT COURT OF THE CITY OF ROANOKE

Commonwealth of Virginia

v.

Tracey Dion Faulkner

April 28, 1999

Case No. CR98-1702

BY JUDGE JONATHAN M. APGAR

The Defendant has filed a motion to suppress evidence seized and statements made as a result of a traffic stop on June 2, 1998. There have been two evidentiary hearings to determine the relevant facts, and the Defendant and the Commonwealth have submitted briefs arguing their respective positions. The Court is now ready to rule.

## I. *Statement of Facts*

At approximately 10:00 p.m. on June 2, 1998, Sgt. R. L. Hague pulled over the Defendant, Tracey Faulkner, for expired tags on his automobile. Almost immediately after Hague pulled Faulkner over, Officer M. L. Pendleton arrived at the scene in his patrol car. Pendleton stood behind Faulkner's car while Hague spoke to Faulkner about the expired tags. Faulkner mentioned that he had already received a citation for them in Bedford County. Hague told Faulkner that he was going to be lenient with him but that Faulkner had better get them fixed. Hague went back to his patrol car to run a check on Faulkner's license and registration. About this time, Sgt. B. T. Clingenpeel, who was doing a traffic stop down the street and had seen Hague pull Faulkner over, sent a message over the radio that Faulkner was known to be involved in

drug activity, by using the code "10-60." Before this message came over the radio, Pendleton asked Hague if he was going to "do a consent search." Hague said that he had not thought to do one but that Pendleton could do one if he wanted. Pendleton went to Faulkner's car and asked if he had any drugs or weapons in the car. Faulkner said he did not. Pendleton asked if he could search the car. Faulkner said no. Pendleton asked Faulkner if he had any drugs or weapons on his person. Faulkner again refused a search. Pendleton repeated these questions and, in response to Faulkner's refusals, asked Faulkner why he would not allow a search if there were no drugs or weapons in the car. Pendleton said that he could get a dog to come and search the car. Faulkner replied that he would not want a dog to search the car. Faulkner testified that this lasted a while until Pendleton walked back to Hague's patrol car.

Pendleton told Hague that Faulkner did not want the car searched and that he was sweating and appeared nervous. Hague finished checking Faulkner's license. Having found no problems with the license or registration, Hague and Pendleton walked back to Faulkner's car and stood next to each other beside the driver's window. Faulkner testified that he had been in the car for about twenty minutes by the time Hague returned to the vehicle. Hague repeated that he was not going to issue a ticket for the expired tags but that Faulkner had better get them fixed.

Hague did not give Faulkner his license at this point.[1] Hague then told Faulkner about Clingenpeel's message that Faulkner was known to be involved in drug activity. Hague asked Faulkner if he knew Clingenpeel. Faulkner said that Clingenpeel was involved in a drug trial with him earlier that day. Hague said that Clingenpeel would be upset if Hague did not find out whether Faulkner had drugs in the car. Hague then asked Faulkner if he had any drugs or weapons in the car. Faulkner replied that he did not. Hague then asked Faulkner if he had any drugs or weapons on his person. Faulkner said he did not. Hague asked if he could search the car. Faulkner said he did not want the car searched. Hague asked if he could search Faulkner's body. Faulkner responded by getting out of the car and putting his hands on the car roof. At some point during this conversation, Pendleton mentioned that a dog could come and check out the car.

While Hague was asking Faulkner to consent to having the car searched or his body frisked, Faulkner asked if he could have his mother come down to

---

[1] The evidence indicates that Hague did not return Faulkner's license until after he was arrested. As Hague cannot remember and Faulkner says it was not returned, the Court holds it was not returned before the arrest.

the scene. The officers asked why Faulkner would want his mother and told him that they could not wait for people to come to the scene in order to search him. Faulkner was sweating profusely. Faulkner testified that Hague asked "not politely" for Faulkner to get out of the car. At the second hearing, Hague was asked whether he would have allowed Faulkner to leave if he had refused a search and driven away. Hague replied he told Faulkner he was not under arrest and was under no obligation to comply. Faulkner testified that if he thought he could have said no and driven away, he would have done so. Faulkner did not believe he was free to leave.

By this time, a third officer, Officer W. G. Boucher, had arrived in his canine unit.[2] Boucher was responding to a call he received on his radio that a canine unit was needed. Boucher testified at the second hearing that when he receives a call for a canine unit, it means that an officer at the scene has requested one. Boucher had the dog lie down on the grass next to the car, and Boucher stood at the passenger side window looking into the car.

Faulkner got out of the car, and Hague frisked him. Hague found no drugs or weapons. Hague asked Faulkner if he could search the car. Faulkner again asked for his mother. Faulkner continued to be reluctant and said there might be "roaches" in the ashtray.

Hague then asked Faulkner to let him inspect the ashtray. Faulkner reached into the car and pulled out the ashtray. While Faulkner was reaching inside the car with one hand, he made a furtive motion with his other hand underneath the driver's seat. After Hague inspected the ashtray and found no marijuana, Hague asked Faulkner what he had just done with his hand underneath the seat. Faulkner replied that there was crack underneath the seat. Hague did a search under the seat and found what appeared to be crack cocaine. Hague then arrested Faulkner. Clingenpeel then arrived on the scene and asked Faulkner what he was doing in light of the fact that he had just been acquitted that day. Faulkner replied that he had to make a living somehow.

## II. *Analysis*

A traffic stop constitutes a seizure for the purposes of the Fourth Amendment. *Deer v. Commonwealth*, 17 Va. App. 730, 733 (1994). A seizure is valid if it is supported by a reasonable suspicion that the seized person is

---

[2] Pendleton testified Boucher was already at the scene when he returned to Faulkner's car with Hague. The presence of Pendleton and Boucher was not revealed until after the first hearing.

involved in criminal wrongdoing. *Id., citing United States v. Cortez*, 499 U.S. 411, 418 (1981). The reasonableness of an officer's suspicion must be based on all the circumstances and must be judged objectively. *Schnecloth v. Bustamonte*, 412 U.S. 218 (1973). As the Supreme Court explained in *Terry v. Ohio*, 392 U.S. 1 (1968), "it is imperative that the facts be judged against an objective standard: would the facts available to the officer *at the moment of the seizure or the search* "warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Deer*, 17 Va. App. at 734, quoting *Terry*, 392 U.S. at 21-22 (emphasis added). The burden is on the Commonwealth to show a warrantless search did not violate an individual's Fourth Amendment rights. *Lowe v. Commonwealth*, 218 Va. 670, 678 (1977), *cert. denied*, 425 U.S. 930 (1978).

It is not contested that the initial stop of Faulkner was valid. The issue is whether, after Hague checked Faulkner's license and registration and determined that he was not going to issue a ticket, Faulkner was then unlawfully detained. Faulkner was unlawfully detained if Hague lacked a reasonable, articulable suspicion that would validate his continued detention. If Faulkner was illegally detained, then the derivative evidence, including Faulkner's statement to Clingenpeel, will be suppressed. *Deer v. Commonwealth*, 17 Va. App. 730 (1994). If Faulkner was not illegally detained, then the issue is whether he gave a valid consent to the search of his person.

The Court finds that the continued detention of Faulkner was not supported by a reasonable, articulable suspicion that he was involved in additional criminal activity. Therefore, the evidence gathered against the Defendant, including the contraband found in the car and Faulkner's statement, will be suppressed. Even if Faulkner was not illegally detained, the Court finds that his consent was not voluntary.

## A. *An Unrelated Detention*

The Commonwealth argues that the post-traffic violation discussion "is either a consensual encounter or a continuation of the initial [valid] conversation." Commonwealth Brief, p. 9. The Court has determined as a factual matter that Faulkner's license was not returned to him before he was arrested. The Commonwealth seems to concede in its brief that this means that Faulkner was seized within the meaning of the Fourth Amendment. Commonwealth Brief, p. 9. This conclusion is supported by the case law. See *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Fernandez*, 18 F.2d

874 (10th Cir. 1994); *Richmond v. Commonwealth*, 22 Va. App. 257, citing *United States v. Lambert*, 46 F.3d 1064 (10th Cir. 1995); *United States v. Thompson*, 712 F.2d 1356 (11th Cir. 1983).

However, the Court will address the Commonwealth's contention that the initial, valid stop of Faulkner had not concluded when Hague started to request that Faulkner allow a search of the car and/or his person. The Commonwealth relies solely on *Commonwealth v. Rice*, 28 Va. App. 374 (1998), to support its position. *Rice* also involved a valid traffic stop. The officer had determined that Rice's license was valid and continued to hold the license in his hand when he asked for Rice's consent to search the car. The officer agreed with Rice that no probable cause existed to search the car, and the officer specifically stated that he would need Rice's consent to search the car. Rice then agreed to allow the officer to search the car. The trial court found that the officer's continued possession of the driver's license resulted in an "unlawful detention that was not supported by 'articulable and specific facts that would allow' the officer to detain the defendant once the officer had determined that the defendant's license was valid." *Id.* at 878.

In its reversal of the trial court's holding, the appellate court explained that once the officer returned to the vehicle with Rice's valid driver's license, the officer had several options. These options included allowing Rice to leave, issuing a summons, or confiscating the registration card, license plates, and decals. Since the officer had not yet done any of these things, the court concluded that the initial stop of Rice was continuing when the officer requested to search the vehicle. *Rice* specifically distinguished itself from *Deer*, which involved an officer who had already issued a citation for the traffic violation when he indicated that he would detain the driver if he did not consent to a search of the vehicle. The facts in this case are more analogous to the facts in *Deer* than those in *Rice*. When Hague returned to Faulkner's vehicle, he told Faulkner that he was not going to issue a ticket. The initial detention concerning the expired tags was resolved, and a new phase of detention had begun.

## B. *Reasonable Articulable Suspicion*

Once the initial stop concerning the expired registration tags on Faulkner's vehicle had concluded, the continued detention of Faulkner must be supported by a reasonable, articulable suspicion that Faulkner was involved in additional criminal activity. *Deer*, 17 Va. App. at 736 (1994). The Commonwealth argues that Hague had a reasonable, articulable suspicion to detain Faulkner once the

valid traffic stop had concluded. The Commonwealth points to the information relayed by Clingenpeel that Faulkner was involved in drug activity and to Faulkner's resistance to a consent search. The Commonwealth argues that these elements, in combination with Faulkner's nervousness (exhibited by his shaking and sweating), created a reasonable, articulable suspicion that Faulkner was involved in criminal activity.

As previously stated, the Court must evaluate the totality of the circumstances in order to determine from an objective viewpoint whether an officer had a reasonable, articulable suspicion of additional criminal activity that would legitimize Hague's further detention of Faulkner. Hague specifically testified that he did not think he had adequate reasons to detain Faulkner against his will until after Faulkner stated that there was crack in the car. However, in *Ohio v. Robinette*, 519 U.S. 33 (1996), the Supreme Court held that an officer's subjective state of mind will not invalidate a detention if the circumstances objectively justify the officer's action. *Id.* at 38, citing *Whren v. United States*, 517 U.S. 806 (1996). The Fourth Amendment requires only that an objectively reasonable basis exist and there is no *per se* rule for reasonableness. *Id.* A reasonable suspicion of wrongdoing is less demanding than is a showing of probable cause. *Richards v. Commonwealth*, 8 Va. App. 612, 616 (1989). However, "the law does not free law enforcement officials from all restrictions concerning vehicle stops." *Sharpe v. United States*, 660 F.2d 967, 970 (1981), citing *United States v. Cortez* (1975). An officer must have more than an "inchoate and unparticularized suspicion or 'hunch'. " *Terry v. Ohio*, 392 U.S. 1, 27 (1968). As the Virginia Court of Appeals recently emphasized: "contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process ... must raise a suspicion that the particular individual is engaged in wrongdoing." *Deer v. Commonwealth*, 17 Va. App. 730 (1994), citing *United States v. Cortez*, 449 U.S. at 418 (1981) (emphasis added).

In this case, the Commonwealth cannot point to any particular act of Faulkner that would substantiate such a reasonable suspicion. The Commonwealth relies heavily on Clingenpeel's message that Faulkner was involved in drug activity. This reliance is appropriate considering it is the major factor in Hague's decision to detain Faulkner. However, Clingenpeel was not at the scene and did not personally observe anything that could support a reasonable suspicion. While a reputation for drug activity in an area, or a person's reputation for criminal activity, can certainly be an element that could contribute to an officer's assessment of the circumstances, it is crucial that the officer observe specific conduct to perform a warrantless search or seizure. See

*Logan v. Commonwealth,* 29 Va. App. 353 (1999) (officers had objective reasonable suspicion to frisk individuals who, in addition to acting nervous and eyeing each other, kept putting hands in pockets and moving around despite being told not to do so); *Langston v. Commonwealth,* 28 Va. App. 276 (1998) (reasonable suspicion that defendant was armed existed where, in addition to fact that individual was in a high crime area and had committed a class 1 misdemeanor in the officer's presence which warranted a search and arrest, individual kept patting side of coat). Faulkner's unwillingness to be searched and his general nervousness do not create the objective level of reasonable suspicion required by the Fourth Amendment. Nervousness and a refusal to be searched are common elements that do not, by themselves, constitute reasonable suspicion. See *United States v. Fernandez,* 18 F.3d 874 (1994) (nervousness is of limited significance in determining reasonable suspicion due to common person's nervousness when confronted with law enforcement officers who ask incriminating questions).

Indeed, the courts have refused to find an articulable reasonable suspicion of criminal activity in cases where there were more specific reasons to believe that an individual was involved in criminal activity. In *Deer,* the officer pulled over an individual who was speeding. The individual did not have a driver's license and gave hesitant and conflicting answers concerning his middle name, birth date, and social security number. The officer was unable to confirm the individual's identity through the DMV, and the individual appeared nervous and refused an initial request to search the vehicle. The individual consented to a search of his car once the officer said he would detain the driver for up to an hour to get a K-9 unit to sniff the vehicle. The Court of Appeals held that "the facts [the officer] relied upon amount to no more than an 'inchoate and unparticularized suspicion or hunch'." *Id.* at 736, quoting *Terry,* 392 U.S. at 27. See also, *United States v. Fernandez,* 18 F.3d 874 (10th Cir. 1994); *United States v. Thompson,* 712 F.2d 1356 (11th Cir. 1983).

Taking the facts as a whole, it is clear that Hague's detention of Faulkner was not based on a particularized suspicion, rather it constituted a "generalized, inchoate suspicion."

## C. *Consent*

The Commonwealth's final argument is that Faulkner consented to the search of his person and that this cures his unlawful detention. This is not the case. Faulkner's decision to get out of the car and be frisked and then his further decision to let Hague inspect the ashtray are not legally distinguishable

from his illegal detention. As in *Deer*, the consent, whether voluntary or involuntary, was a fruit of the illegal seizure. "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." *Id.* at 736. The crack found in Faulkner's car and his subsequent statement that he needed to make a living were not obtained by "means sufficiently distinguishable to be purged of the primary taint." *Id.*, quoting *Seguera v. United States*, 468 U.S. 769 (1984). As in *Deer*, the evidence would not have been obtained but for the illegal detention on the side of the highway.

However, assuming *arguendo* that Hague did have a reasonable, articulable suspicion to detain Faulkner, the evidence would still be suppressed on the grounds that Faulkner's consent was not voluntary. It is well established that an individual may waive the Fourth Amendment right to be free from an unreasonable search and seizure by voluntary consent to a warrantless search. *Bumper v. North Carolina*, 391 U.S. 543 (1968). The test for a valid consent search is whether it was "freely and voluntarily given." *Id.* at 548. In order to determine whether a consent "was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schnecloth v. Bustamonte*, 412 U.S. 218 (1973). The burden is on the Commonwealth to demonstrate that consent was given voluntarily. *Bumper*, 391 U.S. at 548; *Lowe v. Commonwealth*, 218 Va. 670, 678 (1977). The Commonwealth need not show that the Defendant actually knew that he had a right to refuse a search; however, whether the Defendant knew he could refuse a search is a factor that must be considered by the court in its evaluation of the totality of the circumstances. *Id.* The Supreme Court has listed several factors that may be considered in determining whether an individual's consent was voluntary. These include the police officer's conduct, the presence of more than one officer, and the duration, location, and time of the encounter. *United States v. Watson*, 423 U.S. 411, 424 (1976).

The Commonwealth correctly argues that custody alone does not render a consent invalid. *Commonwealth v. Rice*, 28 Va. App. at 377 (1998), citing *Limonja v. Commonwealth*, 8 Va. App. 532 (1989). See *Lowe v. Commonwealth*, 218 Va. 670 (1977). However, where coercion is used to elicit consent, there is a strong suspicion that the consent is invalid. In this case, Faulkner had several reasons to believe that he had no choice but to consent to a search of his person. The strongest factor, of course, is that Hague still possessed Faulkner's license and he was unable to drive away. Faulkner had already denied permission to search his car and his person before Hague returned to Faulkner's vehicle, and Hague knew this. Faulkner remained

reluctant before he was required or asked to get out of the car. As Pendleton testified, there were already three officers and a canine at the scene at that time. In addition, Faulkner felt he had been sitting in the car for more than twenty minutes. These facts strongly support Faulkner's belief that he was not going to be allowed to leave until he consented to a search.

### III. *Conclusion*

For the foregoing reasons, it is ordered that the Defendant's motion to suppress the statements and contraband is granted.