**Kelvin J. HURDLE, Plaintiff,**

v.

**COMMONWEALTH OF VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY, Defendant.**

**No. CIV.A. 3:01CV259.**

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 25, 2002.

Kelvin J. Hurdle, Pro Se Plaintiff.

Martha M. Parrish, Esquire, Office of the Attorney General, Richmond, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Kelvin Jessie Hurdle, proceeding *pro se*, instituted this action against the Commonwealth of Virginia Department of Environmental Quality ("DEQ") alleging racial discrimination, disparate treatment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, defamation, intentional infliction of emotional distress, wrongful discharge, violations of state personnel policy, and failure to follow statutory grievance procedures. Hurdle also sought relief under 42 U.S.C. §§ 1983 and 1985, apparently for alleged violations of the Equal Protection Clause of the Fourteenth Amendment.

Proceeding in accordance with Fed. R.Civ.P. 56, DEQ has moved for summary judgment on three separate grounds. First, DEQ asserts that the *Rooker–Feldman* doctrine deprives the Court of subject matter jurisdiction over Hurdle's claims. Second, DEQ argues that 28 U.S.C. § 1738 and the Full Faith and

Credit Clause, U.S. Const. Art. IV, § 1, cl. 1, preclude Hurdle from litigating his claims in this Court because they were fully adjudicated in previous state court proceedings. Finally, DEQ urges that there exists no genuine issue of any material fact respecting the claims in Hurdle's Amended Complaint.[1]

## STATEMENT OF FACTS

Kelvin Jessie Hurdle graduated from Virginia State University in 1977 with a B.S. in geology. Hurdle also earned a master's degree in geology from the University of South Carolina in 1980. In 1988, Hurdle obtained employment as a geologist with the Virginia Department of Waste Management.

Following work in the hazardous waste program run by that department, Hurdle worked in the personnel section at DEQ for four years. During November of 1998, in lieu of a layoff, Hurdle was reassigned within DEQ to the position of Environmental Engineer Senior, Office of Waste Permitting, where Hurdle reported to Howard Freeland, a white male.[2] Freeland had served on the hiring panel that elected to hire Hurdle in 1988 and had been present during Hurdle's interview for that position. At some point during early 1999, Freeland verbally admonished Hurdle respecting his failure to arrive at work on time and his use of the telephone and facsimile machine for personal business. On July 16, 1999, Freeland issued Hurdle's interim performance evaluation, which was the first failing evaluation Hurdle had received in his 11 years of employment with DEQ.

On August 26, 1999, Hurdle filed a complaint with the Equal Employment Office of the Virginia Department of Personnel and Training ("DPT") alleging racial discrimination in the workplace. In September 1999, Freeland issued Hurdle's annual performance evaluation, which rated Hurdle "fair but needs improvement" in all categories. Following an administrative appeal within the DEQ, Hassan Vakili, having found a lack of sufficient documentation to support the finding made by Freeland, raised Hurdle's evaluation to "meets expectations." According to Vakili, he consulted with his supervisor, David Paylor, and they decided to give Hurdle this relief as a good faith gesture.

Sometime during December 1999, Hurdle again complained to DEQ management about racial discrimination in the workplace, generally. Thereafter, on February 9, 2000, Hurdle filed his first claim with the federal Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination and retaliation for partic-

---

1. Following DEQ's Rebuttal Brief in Support of Motion for Summary Judgment, and less than 11 days before the hearing set for the defendant's motion, Hurdle submitted a number of pleadings for consideration in connection with the motion for summary judgment without first seeking leave to do so, as required by Local Rule 7(e). For that reason and because of prejudice to DEQ, the Court granted DEQ's motion to strike Hurdle's response to DEQ's Rebuttal Brief and Hurdle's pleading entitled "Excerpts of Deposition and Testimony to Oppose Defendant's Motion for Summary Judgment." Acting on its own motion, the Court also struck Hurdle's pleading entitled "Motion to Include Itemized Evidence that Show there are Material Facts that are In Dispute" and Hurdle's "Proposed Stipulations (Joint)."

2. Hurdle's job responsibilities included, among other things, reviewing groundwater monitoring plans and data, determining compliance with environmental regulations, evaluating and drafting permit amendments and variances to regulatory requirements, providing technical assistance and technology transfer to solid waste operators, and responding to interested parties respecting regulations and variances. *Def. Encl.* X.

ipation in protected activities. The EEOC found no basis for Hurdle's claims and thus issued a Right–To–Sue letter on February 29, 2000. On May 26, 2000, Hurdle filed an action in federal court ("Hurdle I") alleging racial discrimination, disparate treatment, hostile work environment, and retaliation in employment in violation of Title VII.

On May 31, 2000, and again on June 6, 2000, supervisors Leslie Romanchik and Freeland, along with Peggy Hawkins of Human Resources, met with Hurdle to discuss his job performance. At these meetings, Hurdle was informed that his interim performance evaluation was "Does Not Meet Expectations," but these DEQ management officials also attempted to discuss with Hurdle how management could help him to improve. Sometime during June 2000, DEQ assigned Larry Syverson to mentor Hurdle. During the 2000 performance cycle, DEQ documented Hurdle's performance more thoroughly and sent him to community college to improve his writing ability. On July 5, 2000, DEQ reduced Hurdle's workload by reassigning a number of Hurdle's projects to his co-workers.

On July 28, 2000, Freeland issued a counseling memorandum to Hurdle, in part, directed to Hurdle's deficient compliance with DEQ's policy for tracking (by the use of "tracking sheets") the timeliness of responses to inquiries made to DEQ. Subsequently, Freeland accused Hurdle of making unauthorized entries on the correspondence tracking sheets. Hurdle responded, by turning the tables on Freeland, charging him with making the unauthorized entries. This dispute later became the basis for what Hurdle is fond of calling the "fraudulent document changes" in subsequent grievances and litigation.

On or about September 15, 2000, Freeland issued an annual performance evaluation for Hurdle, describing his performance as "Does Not Meet Expectation" in each category. Romanchik reviewed the rating and agreed with it. Not long thereafter, in an effort to settle *Hurdle I*, a Magistrate Judge of this Court recommended that Hurdle be assigned a new supervisor. Although DEQ continued to deny all liability, it made a good faith effort to clear the air by assigning Syverson (who had been serving as Hurdle's mentor) to replace Freeland as Hurdle's supervisor. On October 10, 2000, Syverson and Hurdle worked out a performance plan for Hurdle to follow for the ensuing 90 days. On or about October 20, 2000, Syverson issued Hurdle a "Group II Disciplinary Notice" which cited Hurdle for not following Syverson's instructions to inventory the work in Hurdle's office. There was no accompanying suspension or punishment, and, after the appeal, the notice was later removed from Hurdle's employment file. On October 20, 2000, Hurdle filed an EEOC claim in which he claimed racial discrimination and retaliation based on the 2000 evaluation given by Freeland and Romanchik.

On November 16, 2000, DEQ management held yet another counseling meeting with Hurdle, at which both Syverson and Freeland were present. During this meeting, Hurdle was informed that he was not meeting established schedules, and the management representatives attempted to address areas in which Hurdle's performance was deficient. Syverson offered to assign a mentor to improve Hurdle's performance. But Hurdle rejected that offer because it would have required him to work five days per week from 7:00 a.m. to 3:30 p.m., rather than his then current flex schedule of four days per week, which allowed him to operate an outside consulting business. Syverson also offered to

have Hurdle share an office with a coworker in order to facilitate an exchange of ideas and provide prompt answers to Hurdle's questions. Hurdle rejected this offer as well. Instead, on November 27, 2000, Hurdle filed a grievance seeking to have the September 15, 2000 performance evaluation issued by Freeland and Romanchik raised to "meets expectations."

On January 5, 2001, this Court entered an order granting DEQ's motion for summary judgment and dismissing *Hurdle I* with prejudice. That decision was affirmed on appeal. *Hurdle v. DEQ,* CA No. 3:00cv336 (E.D.Va. January 5, 2001) (unpublished) (*"Hurdle I "*), aff'd per curiam 13 Fed.Appx. 197. (4th Cir. July 16, 2001) (unpublished), cert. denied — U.S. ——, 122 S.Ct. 1295, 152 L.Ed.2d 208(2002).

On January 11, 2001, Syverson completed Hurdle's 90–day evaluation, which evaluated Hurdle's efforts in completing the performance plan jointly created on October 10, 2000. This evaluation rated Hurdle as "Does Not Meet Expectation" in all six categories of his performance plan, with an overall performance level of "Does Not Meet Minimum Expectations." As a result, Hurdle was terminated from his position effective January 16, 2001. On January 23, 2001, after investigation, the EEOC issued a second Right–To–Sue letter. That letter responded to the EEOC complaint that Hurdle had filed on October 20, 2000.

On February 14, 2001, Hurdle filed a grievance complaining of the 90–day performance evaluation and subsequent termination. The stated grounds for this grievance included: wrongful termination, retaliatory discharge, termination due to prejudice, and DEQ's failure to adhere to agency employment policies and state grievance procedures.

On March 14, 2001, Hurdle filed another EEOC claim, complaining that his termination was racially motivated and retaliatory. After investigation, the EEOC issued a Right–To–Sue letter on September 26, 2001.

## PROCEDURAL BACKGROUND

On April 20, 2001, Hurdle filed this action. On May 31, 2001, during the pendency of these proceedings, a grievance hearing was convened before a Hearing Officer (the "Grievance Hearing") pursuant to the rules of the Virginia Department of Employment Dispute Resolution. Those rules provide for formal grievance hearings in accordance with the Virginia State Grievance Procedure, Va.Code Ann. § 2.2–3000 *et seq.* (Michie 2001), when a series of three successively higher grievance resolution steps have failed to resolve an employee's complaint. Va.Code Ann. § 2.2–3003. Although such hearings are often the final step in the grievance procedure, a party may appeal to the circuit court in the jurisdiction in which the grievance arose. Va.Code Ann. § 2.2–3006.

Hurdle's Grievance Hearing was a consolidated hearing of two separate grievances. The first grievance, filed on November 27, 2000, concerned Hurdle's September 2000 performance evaluation. Hurdle alleged in this grievance, *inter alia,* that others within his department were not judged according to the same criteria, that others were given more assistance and training in meeting their job requirements, that others were given a lighter workload, that management did not scrutinize the work of others as closely, that documents were fraudulently being placed to create an appearance that Hurdle was guilty of wrongdoing, and that Hurdle had to file grievances in order to achieve equal treatment. In addition, Hurdle checked a box on the

grievance form indicating that he did not present his grievance to his immediate supervisor, Freeland, because he had experienced "discrimination or retaliation" perpetrated by Freeland. *Def. Encl.* X.

The second grievance, filed on February 14, 2001, concerned Hurdle's 90–day performance evaluation and his subsequent termination. Among other things, this grievance alleged that DEQ did not adhere to the DEQ personnel policy when evaluating and terminating Hurdle, and that Hurdle's termination was a result of prejudice and retaliation for his earlier allegations of racial discrimination. *Def. Encl.* X.

In a Qualification Ruling dated April 3, 2001, the Director of the Department of Employee Dispute Resolution consolidated Hurdle's two grievances. The ruling also specified that, at the ensuing Grievance Hearing, DEQ had the burden of proving that the termination was warranted and appropriate under the circumstances while Hurdle had the burden of proving that the September 2000 evaluation was arbitrary, capricious, or retaliatory.

The Grievance Hearing spanned two days, during which Hurdle was represented by counsel. Hurdle was afforded the opportunity to present testimony and documentary evidence and to cross-examine DEQ's two witnesses. The record reflects that Hurdle presented two witnesses, testified on his own behalf, and submitted 23 exhibits.

At the outset of the Grievance Hearing, the Hearing Officer stated that it was his understanding that part of what Hurdle was trying to prove was retaliation. (tr. 9).

Hurdle's attorney asserted that certain exhibits were relevant to prove Hurdle's retaliation claims and, in his opening statement, counsel addressed generally the issues of retaliation and underlying discrimination. (tr. 9). Hurdle's testimony on direct examination included allegations that: (1) his low performance evaluations were retaliation for the *Hurdle I* lawsuit, (tr. 31); (2) he was not allowed the same access to the office as others (all of whom were white) "similarly situated," (tr. 32); (3) his work product was subjected to greater scrutiny than others (all of whom were white) "similarly situated," (tr. 39); and (4) Freeland, his direct supervisor, discriminated against him.[3] (tr. 42).

In opinions dated June 4 and June 21, 2001, the Hearing Officer dismissed all of Hurdle's grievances. In his first opinion, the Hearing Officer found that "[Hurdle] intimates that racial discrimination was a factor in his discharge but he presented no witnesses or documentation to substantiate this allegation." The Hearing Officer also concluded that DEQ complied with the applicable policies and procedures; that Hurdle's performance evaluation was neither arbitrary nor capricious; and that Hurdle's discharge was solely due to his failure to meet the minimum expectations of his employment. In addition, the Hearing Officer determined that a substantial preponderance of the evidence supported DEQ's detailed four-page first step response to Hurdle's November 27, 2000 grievance. This first step response had concluded, *inter alia*, that Hurdle was not subject to unequal treatment and that all

---

**3.** Defense counsel concedes, and the Grievance Hearing transcript reflects, that Hurdle never explicitly mentioned "racial discrimination" during the hearing. Nevertheless, the record does reflect that Hurdle made repeated references to "discrimination" and "other's similarly situated" and it is undisputed that, during the relevant period, all other persons in Hurdle's workgroup were white. On balance, the Hearing Officer had a sufficient basis to conclude that, although Hurdle was raising the issue of racial discrimination, he lacked sufficient evidence to support this claim.

employee work product was adjudged according to the same standards.

In his second opinion, an itemized response to Hurdle's request for reconsideration, the Hearing Officer found no evidence to support Hurdle's allegations of retaliation or a hostile work environment.[4] Rather, the evidence supported a finding that Hurdle's failing performance evaluation was amply supported by documentation and that Hurdle did not achieve the minimum expectations of his position.

On July 20, 2001, Hurdle filed an appeal of the Hearing Officer's ruling to the Circuit Court of the City of Richmond (the "Circuit Court"). Hurdle's brief in support of his notice of appeal claimed that his September 2000 evaluation was arbitrary, capricious, and retaliatory and that this termination was wrongful, unfair, and retaliatory. Hurdle also asserted claims of racial discrimination and disparate treatment, alleging that he was treated differently from "Geoffe X. Christie (White Male)," that he was not given the same access to the workplace "as other white employees," and that his termination was based on disparate treatment during his 90–day evaluation. *Notice of Appeal for Circuit Court Richmond, Brief for Kelvin J. Hurdle As Plaintiff* §§ D, I ("Pl.Cir.Ct.Petition"); *Amended Reply Brief to Employer's Response to Notice of Appeal* §§ III.D, III.K ("Pl.Cir.Ct.Am. Repl."); Hurdle's Circuit Court pleading entitled *Additional Errors Made By Hearing Officer* ¶ 6 ("Pl.Cir.Ct.Addl.Err."). In addition, Hurdle claimed that DEQ violated his "[f]ederal rights as stated and enforced in Title 42 U.S.Code Section 1983." Pl. Cir. Ct. Am. Repl. § F.

Meanwhile, on August 1, 2001, Hurdle filed an Amended Complaint in this action. On October 22, 2001, this Court issued an order staying all proceedings pending resolution of Hurdle's appeal in the Circuit Court of the City of Richmond.

On March 25, 2002, the Circuit Court issued a letter opinion upholding the Grievance Hearing decision in all respects. The Circuit Court understood Hurdle to have alleged "racial discrimination in the form of disparate treatment, creation of a hostile work environment, bias reflected in the excessive scrutiny of his work product, and retaliatory firing." Significantly, the Circuit Court held that DEQ's actions were not arbitrary or capricious and that "though Hurdle argues that the agency motivation was based on racial animus, maintaining a hostile work environment, and disparate treatment ... he does not sufficiently rebut the evidence that he was terminated for deficient performance." On April 24, 2002, Hurdle noted an appeal with the Virginia Court of Appeals.

### DISCUSSION

### I. The *Rooker–Feldman* Doctrine

DEQ argues that, under the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over this action. That contention must be addressed first.

■ The *Rooker–Feldman* doctrine provides that federal district courts lack jurisdiction to hear federal claims that have previously been adjudicated by state courts or that are inextricably intertwined with the merits of a state court judgment. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482, 103 S.Ct.

---

4. Hurdle's claims in his request for reconsideration included, among other things, retaliation for his earlier charges of discrimination and a hostile work environment as evidenced by fraudulent document changes, discrimina-

tory access to the workplace, and the enhanced scrutiny and heightened workload he received in comparison to his white co-workers.

1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 198 (4th Cir.2000); *Edmonds v. Clarkson*, 996 F.Supp. 541, 545 (E.D.Va.1998). A claim is inextricably intertwined with the state court decision if: (1) the party had a reasonable opportunity to raise his federal claim in state proceedings, *Brown & Root*, 211 F.3d at 201; and (2) the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. *Id.*; *Edmonds*, 996 F.Supp. at 545–46. Alternatively, if the federal court is requested to pass on the merits of a state court decision, i.e., "if 'in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual,' *Rooker–Feldman* is implicated." *Jordahl v. Democratic Party*, 122 F.3d 192, 202 (4th Cir.1997) (quoting

*Ernst v. Child & Youth Servs.*, 108 F.3d 486, 491 (3d Cir.1997)).

As indicated above, Hurdle previously sought to resolve certain claims in a Grievance Hearing. The Circuit Court of the City of Richmond subsequently affirmed the Grievance Hearing decision on appeal.[5] It is therefore necessary to examine each count [6] of Hurdle's Amended Complaint in this action to determine whether the federal claims therein previously were adjudicated by either the Hearing Officer or the Circuit Court or were inextricably intertwined with the decision of either tribunal.

The following detailed analysis aside, it should be noted at the outset that the majority of Hurdle's Amended Complaint differs only in organization, not in substance, from Hurdle's brief in support of his notice of appeal to the Circuit Court. Although the stated causes of actions are new, the factual allegations are either identical to, or expansions of, the allegations made in the Circuit Court and during the Grievance Hearing.

**5.** The rationale underlying the *Rooker–Feldman* doctrine is that federal appellate review of state decisions may only be had in the Supreme Court of the United States. Hurdle asserts that the *Rooker–Feldman* doctrine is inapplicable to the instant action because, under the grievance process, the Circuit Court decision is not appealable beyond the Court of Appeals of Virginia and therefore, by Hurdle's reasoning, cannot reach the Supreme Court of the United States. Although an administrative decision that a grievance does not qualify for a hearing is not appealable beyond the Court of Appeals of Virginia, Va.Code § 2.2–3004.E, it does not appear that the Virginia Code so limits appellate review of hearing officer determinations. In any event, the Supreme Court of the United States may review the "final judgments or decrees rendered by the highest court of a State in which review of a decision could be had." 28 U.S.C. § 1257. Thus, Supreme Court review is available once a grievant exhausts all available appeals within the state court system and the Supreme Court may review a decision by a lower state court if no appellate review of

that decision is available within the state. *See* Erwin Chemerinsky, *Federal Jurisdiction*, § 10.4.2 (3d ed.1999). It is for this reason that "[w]e are not in a position ... to demand that the state restructure its appellate system in order for its judgments to be given effect." *Brown & Root*, 211 F.3d at 202.

**6.** In Count IV, and portions of Count III, Hurdle asserted a claim for the tort of intentional infliction of emotional distress and also alleged that DEQ conspired with the Hearing Officer to violate Hurdle's rights in violation of 42 U.S.C. §§ 1983· and 1985. Hurdle abandoned these claims in open court during the hearing on DEQ's motion for summary judgment. In any event, Hurdle asserted identical Section 1983 and Section 1985 allegations before the Circuit Court and therefore may not re-litigate those claims before this Court. *Cf. Jordahl*, 122 F.3d at 202 ("[Plaintiff] may not escape the jurisdictional bar of *Rooker–Feldman* by merely refashioning its attack on the state court judgments as a § 1983 claim.").

A district court may properly invoke *Rooker–Feldman* where the allegations in the plaintiff's state pleadings "clearly implicate" the substance of the federal complaint, or where the federal claims are "but an expansion" of the plaintiff's assertions in the state proceedings. *See, e.g., Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir.2002) (comparing counts in plaintiff's federal complaint to plaintiff's state court motion to compel arbitration); *Alder v. James*, 2000 WL 1825422, at *2–3 (4th Cir. Dec. 13, 2000) (unpublished) (comparing federal complaint to state complaint); *Brooks v. Prince George's County, Maryland*, NO. CIV.A. AW–00–1878, 2000 WL 1708211 (D.Md. Nov.14, 2000) (unpublished) (comparing federal complaint to state complaint).[7]

Therefore, wholly apart from the ensuing count-by-count analysis, the *Rooker–Feldman* doctrine deprives this Court of jurisdiction because, in his Amended Complaint, Hurdle merely has attempted to refashion his state claims. Consideration of those claims here would constitute federal review of the Circuit Court decision, a review that is constitutionally impermissible.

### A. Count I

Count I of Hurdle's Amended Complaint alleges employer retaliation for participation in protected activities in violation of Title VII § 704(a), as amended, 42 U.S.C. § 2000e–3(a). The factual basis for Count I involves, in substantial part, matters previously dismissed with prejudice on summary judgment in *Hurdle I*, e.g., allegations of retaliation due to Hurdle's failing September 1999 performance review. This Court's decision in *Hurdle I* precludes any reconsideration of such matters.

The new retaliatory conduct alleged in Count I consists of: (1) issuing Hurdle an October 20, 2000 "Group II Disciplinary Notice;" (2) issuing a "counseling memorandum;" (3) fraudulently changing documents in a manner that reflected negatively on Hurdle's performance; (4) preventing Hurdle from working after-hours to complete job tasks; (5) terminating Hurdle from employment effective January 16, 2001; (6) failing to assign Hurdle to a new position in a different department in lieu of termination; and (7) wrongfully challenging Hurdle's post-employment benefits.[8]

Hurdle did not invoke Title VII in the Grievance Hearing or in the Circuit Court, but Hurdle did raise there the allegedly retaliatory conduct of which he complains in Count I here. Those assertions of retaliation were abundantly addressed in the pleadings, the testimony, the evidentiary exhibits, the Hearing Officer's decision, and the Circuit Court's opinion.[9] Both the

---

7. Local Rule 36(c) of the United States Court of Appeals for the Fourth Circuit establishes that unpublished opinions are not binding as precedent in the circuit and, in fact, discourages their citation except in unusual circumstances. Nonetheless, unpublished decisions are of utility in assisting the analysis of the issues.

8. Although it appears that the *Rooker–Feldman* doctrine would not apply to Hurdle's claim that DEQ retaliated by wrongfully challenging his claim for post-employment benefits because that allegation was not addressed in the prior state proceedings, Hurdle abandoned that aspect of Count I in open court during the hearing on DEQ's motion for summary judgment.

9. *See, e.g.*, Pl. Cir. Ct. Petition, ¶¶ C (counseling memo and associated meetings), D (counseling memo), F (fraudulent document changes and Group II Disciplinary Notice), I (workplace access), N (Group II Disciplinary Notice), O (workplace access), A2 (workplace access),and Grievance 2 (termination); Pl. Cir. Ct. Addl. Err., ¶ 3 (fraudulent document changes and Group II Disciplinary Notice);

Hearing Officer and the Circuit Court judge ultimately determined that Hurdle's poor performance evaluations and subsequent discharge were not acts of retaliation. Hurdle would have this Court essentially reopen those facts and review the accuracy of the decisions rendered by those state administrative and judicial tribunals. Hurdle's Title VII claim in Count I cannot succeed unless this Court ultimately determines that the Circuit Court and Hearing Officer were erroneous in finding that these actions were not retaliatory. A determination of that sort by a federal district court is precisely the type of appellate review that the *Rooker–Feldman* doctrine forecloses.

## B. Count II

■ In Count II, the Amended Complaint alleges employment discrimination in violation of Title VII § 706, as amended, 42 U.S.C. § 2000e–5. The factual basis for this assertion is that, unlike white employees, Hurdle was "suspended from access to the office after hours and denied access to the files." Hurdle made the same allegation before the Hearing Officer during the Grievance Hearing. The Hearing Officer determined that Hurdle was excluded because "[d]uring that time, the files of the agency were being audited" and "[t]he auditors required that all the files be locked at night thereby making it impossible for anyone to work overtime." *Grievance Hearing Op.*, at 9; *see also Grievance Hearing Response to Reconsideration Request*, at 3, ¶ 8. The Circuit Court affirmed that finding. *Circuit Court Letter Op.* at 6. To find here that Hurdle's exclusion was

discriminatory rather than solely due to the ongoing audit would contravene the *Rooker–Feldman* doctrine.

## C. Count III

■ Count III asserts racial discrimination and disparate treatment claims under Title VII § 706. To the extent that this claim is based on discriminatory access to the workplace, it essentially duplicates portions of Count II and therefore will be disposed of in the same manner.

As an additional basis for the § 706 claim, Hurdle alleges that, on one occasion his former supervisor, Freeland, would only make himself available to discuss a particular matter with Hurdle if Geoffe X. Christie, a white male, wished to discuss the matter. Notably, Hurdle does not allege that Freeland took this action because of Christie's race or, more importantly, because of Hurdle's race. Hurdle makes only the naked assertion that Christie is a "White Male." That, of course, is not a sufficient basis for a discrimination claim of any sort. Moreover, this precise allegation was before the Circuit Court,[10] which refused to credit Hurdle's discrimination claim. Thus, under the *Rooker–Feldman* doctrine, this Court is without jurisdiction to review that determination.

## D. Hurdle's Position On The *Rooker–Feldman* Doctrine

First, Hurdle asserts that the *Rooker–Feldman* doctrine is not applicable to any of his discrimination claims or the retaliation claim because the Qualification Ruling did not mention discrimination[11] and be-

---

Pl. Cir. Ct. Am. Repl., § III.I (workplace access); Cir. Ct. Letter Op. (finding that DEQ's determination that other openings in the agency were not suitable for Hurdle was in accordance with policy and not arbitrary or capricious); Grievance Hearing Op. (deter-

mining that Hurdle was discharged due to failure to meet minimum expectations).

10. *Pl. Cir. Ct. Petition,* ¶ D.

11. Hurdle asserts that he could not raise discrimination issues because his grievances did

cause neither the Circuit Court nor the Hearing Officer considered his allegations of discrimination or retaliation. The pleadings, transcripts, and written opinions in both prior proceedings belie that contention.[12]

Second, Hurdle argues that he could not raise discrimination or retaliation during the Grievance Hearing or Circuit Court appeal because he had not yet received an EEOC Right–To–Sue letter respecting those claims. Contrary to Hurdle's allegation, the EEOC issued a Right–To–Sue letter on January 23, 2001 respecting the complaint that Hurdle had filed on October 20, 2000. In that complaint, Hurdle alleged that he was subjected to continuing acts of retaliation both because he is Black and as a result of his previous EEOC discrimination charges. The EEOC issued a Right–To–Sue letter on September 26, 2001 in response to the EEOC complaint that Hurdle had filed on March 14, 2001. Thus, a Right–To–Sue letter preceded both the Grievance Hearing and the Grievance Opinion. An additional letter was issued before the Circuit Court heard the grievance appeal and before it decided the appeal on March 25, 2002.

Hurdle's argument ignores two fundamental points. Each bears explication.

First, the Virginia State Grievance Procedure allows an employee to qualify for a hearing if his grievance relates to retaliation or "discrimination on the basis of race." Va.Code § 2.2–3004.A(iii, v, and vi); *see also Pignato v. Virginia Dep't of Envtl. Quality*, 948 F.Supp. 532 (E.D.Va. 1996)("Where the grievance procedure is available, it may be used to challenge formal disciplinary actions, applications of written policies and procedures, arbitrary or capricious performance evaluations, acts of retaliation, and discrimination on the basis of race . . . ."). The state's grievance procedure does not provide that an EEOC Right–To–Sue letter is a prerequisite for such a complaint. And, as explained above, Hurdle took advantage of the state grievance procedure by making racial discrimination and retaliation a part of the grievance case presented to the Hearing Officer and the Circuit Court.

Second, having made those issues part of the state grievance procedure, Hurdle may not present a somewhat modified, but integral, aspect of them in a subsequent federal action. "Even if a claim is not presented to a state court . . . a plaintiff is not entitled to bring that claim in federal court if the claim was one

---

not qualify for a hearing on that basis. This argument has conceptual appeal because a hearing officer is is empowered to provide remedies only for "those issues qualified for a hearing." Va.Code § 2.2–3005.C.6. *But see* Va.Code § 2.2–3005.C.7 (empowering the hearing officer to "[t]ake other actions as necessary or specified in the grievance procedure."). Nevertheless, the record reflects that discrimination was indeed addressed in both the Grievance Hearing and the Circuit Court.

12. The Circuit Court treated Hurdle's petition as embracing claims of "racial discrimination in the form of disparate treatment, creation of a hostile work environment, bias reflected in the excessive scrutiny of his work product, and retaliatory firing." *Circuit Court Letter*

*Op.* at 2. Hurdle's Circuit Court pleadings included repeated allegations of retaliation and made repeated references to privileges that were allegedly bestowed on white employees but denied to Hurdle. *Pl. Cir. Ct. Petition*, §§ D, F, I. Hurdle also asserted disparate treatment claims in his Circuit Court pleadings and admits that a ruling that he was terminated for failing to meet minimum job expectations subsumes his disparate treatment claim. *Id.* §§ D, K; *Pl. Cir. Ct. Addl. Err.*, ¶ 6. The Grievance Hearing decision and transcript also show that retaliation, discrimination and disparate treatment allegations were addressed by the Hearing Officer and in Hurdle's testimony. *See, e.g.,* tr. at 9–10, 31–32, 39, 41–42.

that should have been brought in state court." *Guess v. Board of Medical Examiners*, 967 F.2d 998, 1003 (4th Cir. 1992). Having raised his discrimination and retaliation claims in the previous state proceedings, Hurdle was required to present them fully or face the risk that he could never have the omitted aspects of them considered in federal court. DEQ's performance review procedures, the propriety of the performance review, and Hurdle's termination were the primary points of contention in the state proceedings. *Grievance Hearing Op.*, at 2 (stating that the issues to be resolved at the hearing were Hurdle's grievance respecting his 2000 performance evaluation and his subsequent discharge). Hurdle's retaliation and discrimination claims were "part and parcel of the issues pending in, or which could have been raised in," the Grievance Hearing. *Edmonds*, 996 F.Supp. at 551.

The federal claims that Hurdle presents in this action were inextricably intertwined with those that he presented in the state proceedings. He had a full and fair opportunity to litigate the discrimination and retaliation issues in the state proceedings and he, in fact, did so. He cannot, as has been done here, merely recast those issues or add new concepts to them in a subsequent federal action because to do so would require that a federal court review the state court's decision. As such, the *Rooker–Feldman* doctrine deprives this Court of jurisdiction over those claims. *Guess*, 967 F.2d at 1004.

It is well to note that Hurdle was not required to litigate in the state grievance process any claims under Title VII for racial discrimination or retaliation. In-deed, at oral argument, counsel for DEQ acknowledged that Hurdle could have gone forward with the grievance procedure without presenting those claims and that the *Rooker–Feldman* doctrine would not then bar a subsequent timely federal action asserting the Title VII claims. But having chosen to make those claims a part of the grievance procedure, Hurdle, as the DEQ correctly argues, is foreclosed from recasting them for subsequent presentation here. Were that not so, the effect of the *Rooker–Feldman* doctrine would be materially diminished and the constitutional precept that the doctrine implements would be seriously compromised, if not eviscerated.

## III. The State Law Claims In Count II

Count II also makes sundry factual assertions essentially amounting to four claims arising under Virginia law: (1) that the DPT policy respecting employee performance evaluations violates the Virginia Constitution; (2) that "DEQ violated Mr. Hurdle's rights by violating Chapter 10.01 Section 2.1–116.05 of the Code of Virginia;"[13] (3) wrongful termination, apparently under state law; and (4) defamation.

"In exercising supplemental jurisdiction over related state law claims, however, the federal claim must first have substance sufficient to confer subject matter jurisdiction on the district court." *Edmonds*, 996 F.Supp. at 552. Hence, because the Court lacks subject matter jurisdiction over all of Hurdle's federal claims by virtue of the *Rooker–Feldman* doctrine, it also lacks supplemental jurisdiction to resolve these four claims, each of which arise under state law. Under 28 U.S.C. § 1367(c)(3), a court may decline

---

**13.** Section 2.1–116.05 has been repealed. To the extent Hurdle intended to allege that DEQ violated Va.Code Ann. § 2.2–3000 *et seq.*, which recodified § 2.1–116.05 effective Oct.

1, 2001, Hurdle may be understood to allege that DEQ generally failed to follow the employee grievance procedures required by that title.

to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." Section 1367(c)(3) thus grants this Court "wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." *Jordahl v. Democratic Party*, 122 F.3d 192, 203 (4th Cir. 1997). The record discloses no valid reason for this Court to exercise supplemental jurisdiction over Hurdle's non-federal claims and thus the invitation to do so is declined.

## IV. Collateral Estoppel

It is ordinarily preferable not to articulate alternate grounds for decision. *Karsten v. Kaiser Found. Health Plan of Mid–Atlantic States, Inc.*, 36 F.3d 8, 11 (4th Cir.1994). However, considering that dismissal of the federal claims is jurisdictional and that collateral estoppel is a doctrine somewhat related to the *Rooker–Feldman* doctrine, it would seem prudent to address DEQ's argument that Hurdle's federal claims are barred by collateral estoppel.

In accordance with the Full Faith and Credit Clause (U.S. Const.Art. IV, § 1, cl.1) and its enabling statute, a federal court is obligated to accord a state judgment the same preclusive effect to which it would be entitled under the law of the state in which the judgment was rendered. *See* 28 U.S.C. § 1738 ("The records and judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81–82, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Storey v. Patient First Corp.*, 207 F.Supp.2d 431, 457 (E.D.Va.2002).

The Supreme Court repeatedly has concluded that Section 1738 applies to state agency administrative determinations so long as such determinations were reviewed by a state court. *University of Tenn. v. Elliott*, 478 U.S. 788, 794, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ("It is well established that judicial affirmance of an administrative determination is entitled to preclusive effect").[14] Title VII and 42 U.S.C. § 1983 actions are not exempt from this requirement. *Kremer*, 456 U.S. at 477, 102 S.Ct. 1883.

Therefore, the Circuit Court opinion affirming the Grievance Hearing decision precludes Hurdle from asserting claims in federal court if: (1) the Commonwealth of Virginia would give the opinion preclusive effect; and (2) Hurdle asserted those claims either in the Grievance Hearing or in his appeal to the Circuit Court.

### A. Virginia Law On Collateral Estoppel

Virginia law on collateral estoppel is well-settled. *Settle v. S.W. Rodgers Co.*,

---

**14.** The Virginia State Grievance Procedure clearly contemplates a hearing that is judicial in nature. *See, e.g.*, Va.Code § 2.2–3005 (empowering the hearing officer to, *inter alia*, hold settlement conferences, dispose of procedural requests, issue subpoenas, administer oaths, and receive and exclude evidence). To the extent that the Grievance Hearing was judicial in nature, rather than administrative, it is entitled to preclusive effect even absent state court review. *Elliott*, 478 U.S. at 799, 106 S.Ct. 3220 ("When a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.") (quotation and citation omitted).

998 F.Supp. 657 (E.D.Va.1998). The doctrine "precludes parties to a prior action and their privies from litigating in a subsequent action any factual issue that actually was litigated and was essential to a valid, final judgment in the prior action." *TransDulles Center, Inc. v. Sharma,* 252 Va. 20, 22, 472 S.E.2d 274, 275 (Va.1996). For the doctrine to apply, then:

> the parties to the two proceedings, or their privies, must be the same; the factual issue sought to be litigated actually must have been litigated in the prior action and must have been essential to the prior judgment; and the prior action must have resulted in a valid, final judgment against the party sought to be precluded in the present action.

*Settle,* at 665 (*quoting TransDulles* ).

▐▬▬▬▬ The parties in this action are identical to the parties in the previous state proceedings. Findings by a hearing officer acting pursuant to Virginia's statutory grievance procedure are "final, binding, and enforceable in Virginia." [15] *Roberts v. County of Fairfax,* 937 F.Supp. 541 (E.D.Va.1996); *see also Layne v. Campbell County Dept. of Social Services,* 939 F.2d 217 (4th Cir.1991). What remains, then, is to examine Hurdle's Amended Complaint to determine whether each of Hurdle's allegations were: (1) litigated in the prior proceedings; and (2) resolved in a manner that was essential to the judgments in the prior proceedings. In order to discover

precisely what questions were determined by the judgment in a prior action, a federal district court may go behind the judgment and examine the pleadings and evidence in the prior action to determine which facts were essential to the judgment there rendered. *United Shoe Machinery Corp. v. United States,* 258 U.S. 451, 459, 42 S.Ct. 363, 66 L.Ed. 708 (1922), *Azalea Drive–In Theatre, Inc. v. Sargoy,* 394 F.Supp. 568 (E.D.Va.1975).

**B. Estopped Federal Claims** [16]

Count I of Hurdle's Amended Complaint alleges employer retaliation for participation in protected activities in violation of Title VII § 704(a). Counts II and III allege employment discrimination and disparate treatment in violation of Title VII § 706. As earlier explained,[17] the factual allegations underlying each count were litigated in one or both of the prior proceedings. All such allegations were resolved in DEQ's favor. For the following reasons, it seems clear that those allegations were also resolved in a manner that was essential to the prior judgments.

Collateral estoppel may apply if an issue is subsumed within an issue that was explicitly determined. *See* 18 *Moore's Federal Practice* § 13.03[4][c] (3d ed.1998). In other words, the Court may treat an issue as necessary to a judgment in a prior proceeding if, had Hurdle prevailed on the

---

**15.** In reaching this conclusion, the court in *Roberts* relied on aspects of Virginia Code § 15.1–7.2 now recodified at § 15.2–1507. The Grievance Hearing and Circuit Court appeal in the instant case proceeded in accordance with Virginia Code § 2.2–3000 *et seq.,* which is virtually identical to § 15.2–1507 in each of the aspects that controlled the decision in *Roberts,* i.e., the decision of the hearing officer is "final and binding if consistent with law and policy," *id.* § 2.2–3005.D, "a party may appeal on the grounds that the [grievance hearing] determination is contradictory to law by filing a notice of appeal with

the [circuit court]," *id.* § 2.2–3005.B, and "either party may petition the court for an order requiring implementation of the final decision or recommendation of a hearing officer." *id.* § 2.2–3006.C; *see Roberts,* 937 F.Supp. at 545–46.

**16.** The Court has declined to exercise supplemental jurisdiction over Hurdle's non-federal claims.

**17.** *See supra* Part I.A–C.

matter, judgment could not have been rendered in favor of DEQ. *See, e.g., Azalea Drive–In,* 394 F.Supp. at 573 (finding that the state court must have found no duress, because had duress been established, judgment would have been entered in favor of the maker of the note).

At the Grievance Hearing, DEQ had the burden of proving, by a preponderance of the evidence, that Hurdle's termination was warranted and appropriate under the circumstances. *Def. Encl.* X. Hurdle had the burden of proving that his performance evaluations and termination were arbitrary, capricious, or retaliatory. *Id.* The Hearing Officer resolved both disputes in DEQ's favor, concluding that Hurdle was terminated solely due to his failure to meet minimum employment expectations and that the performance evaluations and termination were not retaliatory, arbitrary, or capricious. And, the Hearing Officer held that no evidence supported Hurdle's contentions of racially animated discrimination and retaliation. .

On appeal, the Circuit Court held that DEQ acted in accordance with the law and DPT policy in evaluating and terminating Hurdle and also found that the Grievance Hearing decision was "not contradictory to law." [18] Moreover, the Circuit Court treated Hurdle's petition for review as embracing claims of "racial discrimination in the form of disparate treatment, creation of a hostile work environment, bias reflected in the excessive scrutiny of his work product, and retaliatory firing." All such claims were resolved in favor of DEQ. It is essential to both the Grievance Hearing and Circuit Court judgments that the evaluation and ensuing termination were not retaliatory or discriminatory. Had the

Hearing Officer found otherwise, he could not have ruled that Hurdle was terminated due to his failure to meet minimum expectations. Had the Circuit Court found otherwise, it could not have found that Hurdle failed to rebut the evidence that he was terminated for deficient performance. Because the facts underlying Hurdle's federal claims were essential to these prior judgments, Section 1738 bars Hurdle from relitigating those facts in this Court.

■■■ Hurdle argues that the prior proceedings are not entitled to full faith and credit because, at the Grievance Hearing, the proceedings were tape-recorded rather than transcribed by a court reporter and because the Hearing Officer refused to admit portions of Hurdle's proffered evidence.

The Supreme Court of the United States has held that "redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States,* 440 U.S. 147, 163 n. 11, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). The procedural phenomena noted by Hurdle are not sufficient to raise such a doubt. First, the Virginia State Grievance Procedure empowered the Hearing Officer to "exclude irrelevant, immaterial, insubstantial, privileged, or repetitive proofs" and to "rule upon offers of proof." Va.Code. § 2.2–3005.C.5. To find that Hurdle did not have a full and fair opportunity to litigate an issue because the Hearing Officer determined that certain evidence was not relevant "would be inconsistent with the very rationale upon which the doctrine of collateral estoppel rests." *Pignato,* 948 F.Supp. at 539 n. 7.

---

**18.** That holding subsumes Hurdle's claim that he was wrongfully terminated as well as his claims that DEQ failed to follow the statutory grievance procedure and that the DPT policy violates the Virginia Constitution. Hurdle had unsuccessfully asserted all such claims in his Circuit Court pleadings.

Second, the Virginia State Grievance Procedure requires only that the hearing officer "oversee a verbatim recording of the evidence." Va.Code. § 2.2–3005.C.5. Hurdle cites no legal authority that the recording must occur by other than electronic means in order for the statute to be satisfied or for a grievance hearing or its subsequent appeal to have preclusive effect and the Virginia Code exhibits no such requirement.

Finally, Hurdle asserts that the state proceedings are not entitled to preclusive effect because the Circuit Court appeal was not *de novo*. A similar contention may have swayed the dissenting justices in *Kremer*, but the majority disagreed, noting that "[t]here is no requirement that judicial review must proceed *de novo* if it is to be preclusive." *Kremer*, 456 U.S. at 480 n. 21, 102 S.Ct. 1883. *Contra id.*, 456 U.S. at 491–92, 102 S.Ct. 1883 (Blackmun, J. dissenting).

## CONCLUSION

Including EEOC determinations, secondary and tertiary reviews of his multiple grievances, and a previous adjudication in this very Court, Hurdle has had no less than eight opportunities for impartial review of his multifarious claims of discrimination and retaliation. Hurdle's asserted claims in this action consist exclusively of matters that were previously litigated an' decided in both the Grievance Hearing and Hurdle's subsequent appeal to the Circuit Court. As such, the *Rooker–Feldman* doctrine deprives this Court of jurisdiction to rule on Hurdle's claims. Additionally, because the judgment of the Circuit Court disposed of each of Hurdle's claims and the elements of collateral estoppel are met, Section 1738 precludes relitigation of those claims in this Court. Because summary judgment is appropriate under either or both of these theories, it would be improper for this Court to expound on the merits of Hurdle's claims.

For the foregoing reasons, the defendant's Motion for Summary Judgment is granted and the plaintiff's federal claims are dismissed. Dismissal under the *Rooker–Feldman* doctrine is without prejudice. Dismissal under the alternate ground of collateral estoppel is with prejudice to further litigation in any court except for any appeal under state law of the Circuit Court decision. The plaintiff's state claims are dismissed without prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.